UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF OHIO

NORTHERN DIVISION

| | |
|---|---|
| CLEVELAND BAKERS AND TEAMSTERS ) <br> HEALTH and WELFARE FUND, Individually ) <br> and on Behalf of All Others Similarly Situated, ) <br> 9665 Rockside Road ) <br> Valley View, Ohio 44125 ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> PUBLICIS HEALTH, LLC, ) <br> 375 Hudson Street ) <br> New York, New York 10014 ) <br> ) <br> Defendant. ) <br> ) | No. 1:24-cv-664 <br><br> Judge: <br><br> Class Action <br><br><br> **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

ROBBINS GELLER RUDMAN
& DOWD LLP
MARK J. DEARMAN
DOROTHY P. ANTULLIS
ALEXANDER C. COHEN
ANNY MARTIN
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone: (561) 750-3000

FAULKNER, HOFFMAN
& PHILLIPS, LLC
GEORGE H. FAULKNER
JONAH D. GRABELSKY
20445 Emerald Parkway Dr. Ste. 210
Cleveland, Ohio 44135
Telephone: (216) 781-3600

KESSLER TOPAZ MELTZER
& CHECK LLP
JOSEPH H. MELTZER
DARREN J. CHECK
TERENCE S. ZIEGLER
JORDAN E. JACOBSON
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....................................................................................................1

II. JURISDICTION AND VENUE ..........................................................................10

III. PARTIES ............................................................................................................11

IV. FACTUAL ALLEGATIONS ..............................................................................13

    A.    Purdue Agrees to Be Bound by a Corporate Integrity Agreement After Pleading Guilty to Misbranding Oxycontin ..........................................15

    B.    Purdue Partners with Publicis to Aggressively Increase Its Opioid Sales Despite the Company's Guilty Plea and Corporate Integrity Agreement.............16

        1.    The Sacklers Distance Themselves from Purdue.......................................16

        2.    Purdue Hires Publicis to Devise and Implement an Oxycontin Sales Strategy and Manage Purdue's Reputation to Achieve the Sacklers' Goals ................................................................................19

    C.    Purdue Relies on Publicis to Increase Opioids Consumption and Publicis Aims to Keep Patients on Higher Doses for Longer..............................20

    D.    Purdue Develops Electronic Media Campaigns Designed to Recommend Purdue's Opioids for Diseases for Which They Are Not Indicated.....................32

    E.    Publicis Designs Marketing Strategies to Combat Hesitation Surrounding Opiates as a Decline in Oxycontin Sales Threatens Purdue's Profits...................34

        1.    Publicis Works to Deceive the Public.......................................................34

        2.    Publicis Works to Deceive Doctors ...........................................................36

        3.    Publicis Works to Deceive Patients ...........................................................38

        4.    Publicis Works to Deceive Payors...............................................................38

    F.    Publicis Counters Public Health Efforts to Stop the Opioid Epidemic to Protect Purdue's Profits ........................................................................39

    G.    Publicis Identifies Growth Opportunities for Oxycontin Sales Both in and out of the Current Market ........................................................................42

        1.    Publicis Targets Prolific Prescribers..........................................................44

        2.    Publicis Seeks to Influence No-See Prescribers ........................................47

**Page**

3.      Publicis Aims to Increase Prescribers by Targeting Nurse Practitioners and Physician Assistants .........................................................48

4.      Publicis Goes Beyond Purdue to Grow the Opioid Market ......................50

H.    Publicis' Efforts Extended Oxycontin's Lifespan and Exponentially Expanded the Opioids Epidemic...........................................................................51

I.    Publicis Knew ......................................................................................................52

1.      Guilty Again...........................................................................................54

V.    PUBLICIS' WORK WITH OTHER OPIOID MANUFACTURERS..............................55

A.    ENDO ...................................................................................................................55

1.      Publicis Targets Patients and Targets Prescribers ....................................60

2.      Endo's Broader Relationship with Publicis Groupe ..................................62

B.    TEVA ...................................................................................................................63

C.    JOHNSON & JOHNSON/JANSSEN.................................................................65

D.    Servicing All Manufacturers as a Group .................................................................66

E.    Making Money off the Treatment - Publicis and Orexo AB ...............................67

VI.    TOLLING OF STATUTES OF LIMITATIONS ...............................................................70

VII.    HARM CAUSED TO PRIVATE PAYORS, INCLUDING PLAINTIFF AND CLASS MEMBERS............................................................................................................74

VIII.    CLASS ACTION ALLEGATIONS .................................................................................75

IX.    CLAIMS FOR RELIEF ....................................................................................................80

X.    JURY DEMAND ...............................................................................................................120

XI.    PRAYER FOR RELIEF ....................................................................................................120

## I.    INTRODUCTION

1.     The opioid epidemic has become an all too well known crisis that has plagued our country for the better part of the last three decades.

2.     As the push to expand prescription opioid use began in the late 1990s, Americans became increasingly at risk at being affected either directly or indirectly by the opioid disaster. The lesser-known truth is that greed and the desire to capitalize on pain is what drove the expansion of the opioid crisis into families and homes across the country.

3.     Since the push to expand prescription opioid use began in the late 1990s, the death toll has climbed without any indication of slowing down.  The number of opioid overdoses in the United States rose from 8,000 in 1999 to over 20,000 in 2009.  In the 20 year period between 1999 and 2020, 565,000 Americans died of opioid-involved overdoses.[1]  In the 12-month period ending April 2023 alone, opioids claimed 111,355 lives.[2]



**Figure 1. Drug-Related Overdose Deaths in the United States, by Opioid Involvement, 1999-2020**

**Source:** CRS analysis using data from CDC WONDER.

---

[1]    Jonathan H. Duff, et al., *The Opioid Crisis in the United States: A Brief History*, CONGRESSIONAL RES. SERV. (Nov. 30, 2022), https://crsreports.congress.gov/product/pdf/IF/IF12260.

[2]    Deidre McPhillips, *Overdose deaths continue to rise in the US, reaching another record level, provisional data shows*, CNN (Sept. 13, 2023), https://www.cnn.com/2023/09/13/health/overdose-deaths-record-april-2023/index.html.

4.     The proliferation and expansion of the opioid epidemic would not have been possible without the rigorous and deceptive marketing of prescription opioids.  For nearly a decade, Publicis Health, LLC ("Publicis") designed and implemented marketing strategies for major opioid manufacturer and maker of the infamous OxyContin, Purdue Pharma, L.P. ("Purdue"), and others, to increase the demand for opioid prescriptions and the sale of opioids.

5.     Plaintiff Cleveland Bakers and Teamsters Health and Welfare Fund ("Cleveland Bakers") brings this action to prevent future harm and to redress Defendant's past wrongs for its role in proliferating opioid use disorder, opioid abuse, and addiction by relentlessly championing and facilitating aggressive false marketing campaigns.

6.     On May 10, 2007, John Brownlee ("Brownlee"), United States Attorney for the Western District of Virginia, announced the guilty plea of the Purdue Frederick Company, the parent of Purdue, relating to the misbranding of OxyContin.  Brownlee stated:

> Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal.  In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market.

7.     Along with the guilty plea, Purdue agreed to a Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services ("HHS").  For a period of five years, ending in 2012, Purdue was obligated to retain an independent monitor and submit annual compliance reports regarding its marketing and sales practices and training of sales representatives *vis-à-vis* their interactions with health care providers.

8.     In the wake of Purdue's accession to the Corporate Integrity Agreement, Purdue faced newly imposed constraints on its sales and marketing practices.  The Corporate Integrity

Agreement became a problem Purdue wanted to solve. Despite the agreement's constraints (*i.e.*, do not lie about OxyContin), Purdue and its controlling owners, the Sackler family, still intended to maximize OxyContin sales.

9. Given concern over this "concentration of risk," the Sackler family spent considerable time and energy debating the best way to achieve distance from Purdue, and they collectively considered a variety of options for doing so. One option was to sell the company to or merge the company with another pharmaceutical manufacturer. The proceeds of such a transaction could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

10. Another option was to have Purdue borrow money in order to assure Purdue had adequate funds to continue operating while the Sacklers, as owners, began to make substantial distributions of money from the company to themselves. Once again, the proceeds of the distributions could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

11. To pursue *either* option, the Sacklers needed to maximize opioid sales ***in the short term*** to make Purdue – by then the subject of substantial public scrutiny – appear to be either an attractive acquisition target or merger partner to another pharmaceutical manufacturer or a creditworthy borrower to a lender.

12. In short, the Sacklers prepared to engage in a final flurry of opioid-pushing to rid themselves of their pharmaceutical company dependency for good.

13. Given the complexity of the problem, the Sacklers and Purdue realized they needed assistance to achieve these internally contradictory objectives. Purdue did not have the in-house capability to design and implement a sales strategy for OxyContin that would achieve the Sacklers'

desired objectives.  Ultimately, Purdue hired Rosetta Marketing Services, LLC ("Rosetta") to design and implement marketing tactics to maximize sales of Purdue opioids including OxyContin, and by April 2010, Rosetta and Purdue were working together to increase Purdue's opioids sales.[3]

14.     In May 2011, Publicis Groupe S.A. ("Publicis Groupe"), a marketing and public relations conglomerate with principal offices in Paris, France and organized under French law, acquired Rosetta.  Publicis Groupe is one of the world's largest advertising agencies and one of the "Big Four," the four firms that comprise more than half of the global advertising industry.  By October of 2021, Publicis Groupe was the largest advertising conglomerate in the world, with a market capitalization in excess of $16 billion.[4]

15.     Later, in May 2015, when Publicis Groupe restructured, Saatchi & Saatchi Healthcare Communications ("Saatchi & Saatchi") (doing business as "Razorfish Health") assumed Rosetta's role and its liabilities as Purdue's marketing agency for dangerous opioids, including OxyContin.

16.     In November 2015, upon the advice of Razorfish Health, Purdue executed a noncompetitive Bid Exception form to contract with Verilogue Inc. ("Verilogue")[5] to record and analyze conversations among pain patients and their doctors and nurses, to make Purdue's marketing more effective in getting doctors to prescribe Purdue's drugs.  Verilogue recorded patient-physician conversations in exam rooms and hospitals and provided analyses of these

---

[3]     In April 2010, Rosetta entered into a Marketing Services Agreement with Purdue Pharma, L.P.

[4]     *See* Gideon Spanier, *Publicis overtakes rivals to be world's most valuable agency group, PR Week*, PRWEEK (Oct. 27, 2021), https://www.prweek.com/article/1731568/publicis-overtakes-rivals-worlds-valuable-agency-group.

[5]     Verilogue Inc. is an assumed registered name under which Publicis performs market research and data analytics.

recorded conversations to Publicis Groupe agencies for use in marketing campaigns for healthcare clients, including Purdue.

17.     In June 2016, Razorfish Health and Purdue amended their services agreement to bring in Publicis Health Media, LLC ("Publicis Health Media"), to work on Purdue's marketing campaigns.  As part of its efforts for Purdue, Publicis Health Media was to fight negative press about OxyContin and substance use disorder and to implement marketing strategies inside a prescriber's electronic health records systems.

18.     In December 2016, Saatchi & Saatchi merged with Publicis Healthcare Communications Group and became Publicis.  Publicis is a global marketing company, headquartered in New York, New York, and is owned by parent company Publicis Groupe. Publicis has 40 offices and 11 brands worldwide and it controls agencies engaged in healthcare marketing throughout the United States.  Publicis performs media and public relations work for its healthcare clients through Publicis Health Media.

19.     Publicis and all of its subsidiary and trade name agencies are ultimately owned by Publicis Groupe, the French global marketing and public relations company.  Publicis Groupe claims to have reinvented itself from a "Holding Company to a platform" ready for the "Connected Age" and advertises itself as a "borderless, seamless service" to clients that is "free from silos," with "unified P&Ls" and no "operational barriers."[6]  Essentially, Publicis Groupe serves as the "Connecting Company" for its agencies and provides each client with access to all of the agencies'

---

[6]     *About Publicis Groupe*, PUBLICIS GROUPE, https://www.publicisgroupe.com/en/the-groupe/about-publicis-groupe (last visited Mar. 8, 2024).

expertise, by following its *Power of One* business model and assigning a Client Leader to each major client.[7]

20.     Given its business model, Publicis knew that its marketing campaigns for Purdue and others would be used to influence prescribers and patients.  While Publicis Groupe boasts that it requires all of its agencies to follow Responsible Marketing Key Principles that are "applied to all forms of commercial communication delivered by Publicis Groupe agencies everywhere" and promises that "ALL marketing communication ha[s] to be legal, decent, honest, and truthful . . . [w]ithout any exceptions[,]"[8] Publicis and its agencies conducted prolific opioid marketing campaigns that were illegal, indecent, and dishonest.

21.     Through the years, Publicis has acquired and developed particular expertise in serving the pharmaceutical industry.  Publicis – through its myriad divisions – serves multiple pharmaceutical manufacturers in advertising their drugs.  It relies on the healthcare sector for approximately 13% of its annual revenue, making it one of the largest industry sectors by revenue for the conglomerate.[9]

22.     Despite the strictures imposed upon Purdue by the Corporate Integrity Agreement, from 2010 until 2019, Publicis – through its acquisitions, mergers, restructuring, and assumption

---

[7]     *2019 Universal Registration Document, 2019 Annual financial report*, at 5, 24, PUBLICIS GROUPE, https://www.publicisgroupe.com/sites/default/files/investors-document/2020-05/PBS2019_URD_EN_180520.pdf (last visited Mar. 8, 2024); *About Publicis Groupe*, *supra* n.6.

[8]     *Responsible Marketing and Communication – Key Principles*, at 1, PUBLICIS GROUPE, https://publicisgroupe-csr-smartdata.com/assets/upload/en/Responsible%20Marketing.pdf    (last visited Mar. 8, 2024).

[9]     *See H1 2021 Results*, at 15, PUBLICIS GROUPE (July 22, 2021), http://documents.publicisgroupe.com/resultat2021/Presentation-H1-2021-RESULTS.pdf.

of legal and registered names[10] – was able to provide marketing schemes and analysis to Purdue that contributed and facilitated unprecedented levels of opioid use disorders, overdoses, and deaths.  Publicis and its agencies engaged in an incessant course of aggressive and deceptive marketing schemes that caused pain patients to suffer, overdose, and eventually die.

23.    In 2012, as Purdue's Corporate Integrity Agreement ended, Publicis' ongoing relationship with Purdue flourished.  Throughout its relationship with Purdue, Publicis devised and Purdue implemented unfair and deceptive marketing campaigns designed to push doctors to prescribe opioids to more patients, in higher doses, and for longer periods of time.  Publicis' campaigns targeted the most dangerous prescribers.  Purdue and Publicis deployed illegal advertisements embedded within patients' electronic medical records with messages aimed at getting doctors to convert patients to OxyContin, increase doses, and keep patients on OxyContin longer.

24.    Although the introduction of OxyContin by Purdue in the late 1990s is widely acknowledged as a precipitating cause of the opioid crisis, Purdue was not alone in enthusiastically inciting and exploiting the booming market of controlled substances used for the treatment of pain.  Publicis played a vital role in an industry-wide sales and marketing effort that it deployed over years to maximize the amount of opioids that could be sold.

25.    The sales and marketing efforts to sell opioids to as many individuals as possible, even when they were known to be addictive, were not solely designed by manufacturers, like Purdue, nor did the manufacturers implement these tactics on their own.  Rather, pharmaceutical

---

[10]   Publicis Groupe acquired companies like Rosetta and caused others like Razorfish Health, Publicis Health Media, and Verilogue to merge or reorganize.

manufacturers routinely relied on companies like Defendant's to design and implement the sales and marketing strategies used to sell opioids.

26.     Publicis proudly took on this role as it engineered sales and marketing campaigns for numerous opioid manufacturers, while also working to identify the optimal targets for the different messages it was delivering on behalf of its clients.  In many instances, pharmaceutical manufacturers would outsource practically the entire business of selling its drugs.  Through Publicis Touchpoint Solutions, Publicis provided entire sales forces on a contract basis to be used by their manufacturer clients to detail prescribers.

27.     Given its partnerships with multiple clients, Publicis had a unique role.  While it strategized on how to help competing brands sell opioid products contemporaneously, it served as a sort of hub, collecting knowledge of what numerous competitors within the industry were doing with respect to designing sales and marketing campaigns that would seek to spread the sale and use of prescription opiates.  Indeed, Publicis worked with industry-wide groups to address challenges that the entire opioids industry faced and compiled invaluable insights and business intelligence, which it capitalized on by selling its industry knowledge and marketing acumen to numerous clients.

28.     For about a decade, on information and belief, Publicis collected more than $50 million from Purdue for dozens of unfair and deceptive marketing schemes and for conspiring with Purdue to sell more opioids, in higher doses, for longer periods of time.  Publicis was so committed to the campaign that it became entwined with the OxyContin giant.

29.     In 2013, despite significant headwinds, OxyContin sales finally peaked.  The restrictions on Purdue's sales and marketing methods contained in the Corporate Integrity Agreement should have resulted in fewer overall OxyContin sales: the guilty plea identified a

specific segment of existing OxyContin sales that were illegitimate and should, thus, cease.  All else being equal, OxyContin sales should have decreased to account for the successful snuffing out of improper sales.  In fact, OxyContin sales did decrease in the immediate aftermath of the 2007 guilty plea.

30.     However, with Publicis' help, within five years of the plea OxyContin sales would triple.  Publicis presented specific plans to Purdue, which Purdue adopted and spent hundreds of millions of dollars implementing.  The result: an enormous wave of OxyContin sales.[11]

31.     Like any other participant in the Opioid Marketing Enterprise (defined herein), Publicis must be held accountable for its misconduct.  Publicis is liable for its successful efforts to increase OxyContin sales after Purdue's 2007 guilty plea for misbranding the drug.  Indeed, Publicis' primary goal was to increase the sales of the drug despite Purdue's guilty plea to misbranding and despite the Sacklers' wish to exit the opioid market due to the perceived reputational risks of remaining there.

32.     Once it was hired, Publicis' goal was to increase OxyContin sales in spite of the restrictions imposed by the five-year Corporate Integrity Agreement.  Publicis did not hesitate, although it knew or had reason to know that OxyContin was addictive and deadly.

33.     All of Purdue's managerial acrobatics were necessary for it to seem financially attractive enough that a potential buyer would be willing to discount (or even overlook) the otherwise obvious risks associated with purchasing the maker of OxyContin.  Purdue was the proverbial hot potato that the Sackler family hired Publicis to help hand over to someone else.  As

---

[11]   On February 10, 2018, Purdue announced that it is no longer marketing opioids and disbanded its OxyContin sales force.  *OxyContin maker Purdue will stop selling doctors on opioids*, PBS NEWS HOUR (Feb. 11, 2018), https://www.pbs.org/newshour/show/oxycontin-maker-purdue-will-stop-selling-doctors-on-opioids.

for Publicis, it was all too happy to help as it devised a successful strategy to purposefully increase the amount of OxyContin sold in the United States.

34.     In the end, of course, the Sacklers pressed on and squeezed Purdue until its eventual demise in 2019.  While the full scope of the opioid crisis has become clearer, opioid abuse continues to plague pain patients claiming the lives of hundreds of thousands of Americans each year, all at a great cost to the national healthcare system.

35.     Publicis' unethical and unlawful behavior is a matter of grave public importance. In addition to Purdue, Publicis provides services to many more companies Americans rely on for powerful drugs.  Thus, Publicis plays a major role in deciding how drugs are marketed, prescribed, sold, and eventually consumed in America.

## II.     JURISDICTION AND VENUE

36.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, as Plaintiff brings claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et seq.*, which raise a federal question.  This Court also has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because: (a) there are 100 or more Class members; (b) at least some Class members, including Plaintiff, are citizens of a state that is diverse from Publicis; and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.  This Court has supplemental jurisdiction over the Plaintiff's state law claims under 28 U.S.C. §1367 as those claims are so related to the RICO claim that they form part of the same case or controversy.

37.     This Court has personal jurisdiction over Publicis under Ohio Rev. Code §2307.382 and because the causes of action alleged in this Complaint arise out of, or relate to, Publicis' transacting business in the State of Ohio and this District, including, contracting to supply services or goods in this state, causing tortious injury by an act or omission in this state, and because

Publicis regularly does or solicits business or engages in a persistent course of conduct or derives substantial revenue from goods used or consumed or services rendered in this state.

38.     At all times relevant hereto, Publicis engaged in the business of researching, designing, and implementing marketing and promoting strategies for opioid manufacturer, Purdue, that were intended to be, and were, implemented in, or whose implementation had a substantial and intended effect in Ohio.  In sum, Publicis purposefully directed its actions towards Ohio and/or has the requisite minimum contacts with Ohio to satisfy any statutory or constitutional requirements for personal jurisdiction.

39.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims occurred in the Northern District of Ohio.  Venue is also proper under 18 U.S.C. §1965(a) because Defendant resides, is found, have agents, or transact their affairs in this District.

## III.   PARTIES

40.     Plaintiff Cleveland Bakers and Teamsters Health and Welfare Fund is a multi-employer trust fund established to provide health and welfare benefits to collectively bargained members represented by Bakers' Union Local No. 19 and Teamsters Local Union No. 507. Cleveland Baker's principal office is located at 9665 Rockside Road in Valley View, Ohio 44125. Cleveland Bakers indirectly purchased, paid, incurred costs, and/or reimbursed for prescription opioid drugs manufactured, marketed, sold, or distributed by Purdue and other Opioid Marketing Enterprise Members (defined in the RICO claim below), for purposes other than resale (intended for consumption by its participants, covered dependents, and covered retirees), and incurred costs for treatment related to the misuse, addiction, and/or overdose of opioid drugs during the class period.  Given its participants', covered dependents', and retirees' history of opioid purchases and need for medical care resulting from opioid abuse or addiction, Cleveland Bakers anticipates that

- 11 -

it will continue to purchase and/or provide reimbursement for opioids and/or incur costs for opioid related treatment in the foreseeable future.

41.     Defendant Publicis Health, LLC f/k/a Publicis Healthcare Communications Group is a Delaware limited liability company with its principal place of business at 375 Hudson Street. Bsmt 1, New York, New York 10014-7464.  Publicis is a healthcare marketing company that promotes itself as much more than a mere advertising broker.  Instead, it is a team of "more than 3,000 healthcare professionals" who achieve "marketing and business transformation" with "world-class talent and game-changing capabilities."

42.     Publicis is registered to do business in Ohio, and it solicits and regularly conducts business in Ohio.  Publicis derives substantial revenue from the services it renders in this state, including, until recently, services it rendered to the marketing of Purdue's dangerous opioids: OxyContin (extended-release oxycodone), Butrans (extended-release buprenorphine), and Hysingla (extended-release hydrocodone).  Publicis performs some of its healthcare marketing business, including for Purdue, under the registered assumed name Razorfish Health.  Publicis performs healthcare market research and data analytics under the registered assumed name Verilogue.  Publicis is part of a consortium of entities that do business in Ohio and throughout the United States under the umbrella of parent company Publicis Groupe,[12] which maintains an office at 629 Euclid Avenue, 15th Floor, Cleveland, Ohio 44114, and is registered to do business in Ohio.

43.     In September 2019, in the wake of thousands of lawsuits accusing the company of grievous misconduct for its role in causing the opioid epidemic, Publicis' top opioid client, Purdue, filed for bankruptcy.  In Purdue's bankruptcy case, more than one hundred thousand personal

---

[12]     *About Publicis Groupe*, *supra* n.6 ("Publicis Groupe is organized into 4 Solutions Hubs for easier connectivity and integration: Publicis Communications, Publicis Media, Publicis Sapient, and Publicis Health").

injuries claims were filed.  States and local governments filed claims for trillions of dollars in harm.

44.    On October 20, 2020, Purdue – Publicis' co-conspirator – agreed with the United States Department of Justice ("DOJ") to plead guilty to improper marketing of OxyContin and other opioids again.  This time the plea agreement with Purdue concerned conduct from 2010 to 2018 and included $8.3 billion in penalties from Purdue and $225 million from the Sackler family.

45.    In November 2020, the Sackler family and Purdue settled the civil claims by the DOJ and Purdue's guilty plea to felonies spanning a decade was entered.  The materials filed in connection with that plea and settlement refer to schemes that Publicis devised and helped implement.  Publicis must be held accountable for its role in the opioid epidemic.

## IV.    FACTUAL ALLEGATIONS

46.    This lawsuit concerns Publicis' work for opioid manufacturers, including Purdue and its owner, the Sackler family, beginning at least as early as 2010, and in particular Publicis' work in the years after Purdue's 2007 guilty plea relating to its sales and marketing strategy for opioids.  From 2010 until 2019, Purdue was Publicis' top opioid client, and Publicis was Purdue's number one marketing partner.  Publicis provided marketing plans, public relations advice, and analyses, which allowed Purdue to target influence over more potential opioid prescribers than ever before.  As the below chart shows, within just four years of retaining Publicis, Purdue went from targeting 5,000 prescribers to 400,000, from sending 22,000 emails to prescribers in 2010 to sending 12,000,0000 emails in 2013.  During the same period, Purdue went from having one website dedicated to targeting prescribers to having eight.



Source: Purdue Infographic

47.     In May of 2010, Publicis was advising Purdue on precisely the same sales and marketing strategy and practices for OxyContin that were the subject of the Corporate Integrity Agreement, which was supposed to bind Purdue to honest and transparent marketing regarding its opioids.  But, Publicis disregarded the Corporate Integrity Agreement and continued its work after the expiration of the Corporate Integrity Agreement and at least through 2019.

48.     By 2015, Publicis was marketing all three of Purdue's dangerous opioid drugs: OxyContin, Butrans, and Hysingla.  At all relevant times, Publicis knew that the opioid crisis was tied to prescription opioids like OxyContin and that the crisis was getting worse.  Publicis' staff tracked and circulated articles and studies chronicling the mounting rates of opioid use disorder and overdose deaths across the country.  Notwithstanding the mounting evidence of harm and damage that was being done to communities nationwide, Publicis doubled down to keep OxyContin prescriptions flowing to as many patients as possible.

A.    **Purdue Agrees to Be Bound by a Corporate Integrity Agreement**
      **After Pleading Guilty to Misbranding Oxycontin**

49.     On May 10, 2007, the Purdue Frederick Company, Purdue's parent company, as well as three of Purdue's officers, pleaded guilty to the misbranding of OxyContin pursuant to various provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §301, *et seq.*

50.     Purdue admitted that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."

51.     Concurrent with the Purdue Frederick Company's guilty plea, Purdue entered into a Corporate Integrity Agreement with the Office of Inspector General of HHS on May 7, 2007.

52.     Under the Corporate Integrity Agreement, Purdue was obligated to comply with its terms for a period of five years, expiring on May 10, 2012.

53.     Pursuant to the Corporate Integrity Agreement, Purdue was obligated to implement written policies regarding its compliance program and compliance with federal health care program and U.S. Food and Drug Administration ("FDA") requirements, including:

(c) selling, marketing, promoting, advertising, and disseminating Materials or information about Purdue's products in compliance with all applicable FDA requirements, including requirements relating to the dissemination of information that is fair and accurate. . . including, but not limited to, information concerning the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products;

(d) compensation (including salaries and bonuses) for Relevant Covered Persons engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products;

                         *        *        *

(g) the process by which and standards according to which Purdue sales representatives provide Materials or respond to requests from HCP's [health care providers] for information about Purdue's products, including information concerning withdrawal, drug tolerance, drug addiction, or drug abuse of Purdue's products . . . [including] (i) the form and content of Materials disseminated by sales

representatives[,] and (ii) the internal review process for the Materials and information disseminated by sales representatives.[13]

54.    Purdue was also obligated to engage an Independent Review Organization to ensure its compliance with the strictures of the Corporate Integrity Agreement, and to file compliance reports on an annual basis with the Office of Inspector General of HHS.

**B.    Purdue Partners with Publicis to Aggressively Increase Its Opioid Sales Despite the Company's Guilty Plea and Corporate Integrity Agreement**

55.    The Sackler family has owned and controlled Purdue and its predecessors since 1952.  At all times relevant to this Complaint, individual Sackler family members occupied either six or seven of the seats on Purdue's board of directors ("Board"), and at all times held a majority of Board seats.  To advise the Board of Purdue was to advise the Sackler family.  The interests of the Sackler family and the Purdue Board, and Purdue itself, as a privately held company, are all aligned.  Practically, they are indistinguishable.[14]

### 1.    The Sacklers Distance Themselves from Purdue

56.    After the 2007 guilty plea, the Sackler family began to reassess its involvement in the opioid business.  On April 18, 2008, Richard Sackler, then the co-chairman of the Board along with his uncle, communicated to other family members that Purdue's business of selling

---

[13]  *Corporate Integrity Agreement Between the Office of Inspector General of the Department of Health and Human Services and Purdue Pharma L.P.* (May 8, 2007), https://www.documentcloud.org/documents/6452110-2007-Purdue-Corporate-Integrity-Agreement.

[14]  Craig Landau ("Landau"), soon to become Chief Executive Officer ("CEO") of Purdue, acknowledged in May 2017 that Purdue operated with "the Board of Directors serving as the 'de facto' CEO."  The future CEO of the company, in other words, understood that he would have little practical power despite his new title.  The owners ran the business.  *See The Role of Purdue Pharma and the Sackler Family in the Opioid Epidemic,* HEARING BEFORE THE COMMITTEE ON OVERSIGHT AND REFORM HOUSE OF REPRESENTATIVES (Dec. 17, 2020), https://www.govinfo.gov/content/pkg/CHRG-116hhrg43010/html/CHRG-116hhrg43010.htm.

OxyContin and other opioids was "a dangerous concentration of risk."  Richard Sackler recommended a strategy of installing a loyal CEO of Purdue who would safeguard the interests of the Sackler family, while at the same time positioning Purdue for an eventual sale by maximizing OxyContin sales.

57.     In the event that a purchaser for Purdue could not be found, Richard Sackler conveyed that Purdue should increase its free cash flow to the Sacklers.  This would have the effect of maximizing the amount of money an owner could take out of a business, and is a tacit acknowledgement that reinvestment of profits in the business was not a sound financial strategy.  It is, in other words, an acknowledgement that Purdue's reputation and franchise was irrevocably damaged, and that Purdue's opioid business was not sustainable in the long term.

58.     By 2017, with the hope for any acquisition now gone, the Sacklers' decision to milk opioid profits by distributing more free cash flow on the way down had its natural effect on Purdue.  Craig Landau, the then CEO, is believed to have criticized the Sacklers for  de-emphasizing and minimizing R&D at Purdue, leaving the company unable to innovate.

59.     In fact, in the years after the 2007 guilty plea, Purdue would retain only the absolute minimum amount of money within Purdue as possible: $300 million, which was the amount that Purdue was required to retain pursuant to a "partnership contract [that Purdue had] with another company."  Otherwise, all the money was distributed to the owners.[15]

60.     Concurrently, the Sacklers backed away from day-to-day jobs at Purdue.  During the ongoing investigation that resulted in the 2007 guilty pleas, "several family members who

---

[15]  *See* Jared S. Hopkins, *At Purdue Pharma, Business Slumps as Opioid Lawsuits Mount*, WALL ST. J. (June 30, 2019), https://www.wsj.com/articles/purdue-pharma-grapples-with-internal-challenges-as-opioid-lawsuits-mount-11561887120?mod=hp_lead_pos6.

worked at Purdue stepped back from their operational roles."[16] In 2003, Richard Sackler himself resigned as the president to assume his role of co-chairman. Dr. Kathe Sackler and Jonathan Sackler chose to exit their roles as senior vice presidents. Mortimer D.A. Sackler quit being a vice president.

61. However, the Sacklers remained on the Board.

62. At the time Richard Sackler communicated these plans to distance the family from Purdue, the Sacklers had already established a second company, Rhodes Pharmaceuticals L.P. ("Rhodes"). The Sacklers established Rhodes *four months* after the 2007 guilty plea.[17] Rhodes' purpose was to sell generic versions of opioids. It was, in other words, a way for the Sacklers to continue to make money off of opioids while separating themselves from Purdue. By 2016, Rhodes held a larger share of the opioid market than Purdue. Through Purdue, the Sacklers controlled 1.7% of the overall opioid market. When combined with Rhodes, however, the Sacklers' share of the overall opioid market was approximately 6% of all opioids sold in the United States.[18]

---

[16] Barry Meier, *Pain Killer: An Empire of Deceit and the Origin of America's Opioid Epidemic* 167 (2nd ed. 2018).

[17] David Crow, *Billionaire Sackler family owns second opioid maker*, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/2d21cf1a-b2bc-11e8-99ca-68cf89602132.

[18] *Id.*

### 2. Purdue Hires Publicis to Devise and Implement an OxyContin Sales Strategy and Manage Purdue's Reputation to Achieve the Sacklers' Goals

63. The Sacklers faced a problem: the need to grow OxyContin sales as dramatically as possible so as to make Purdue an attractive acquisition target or borrower, while at the same time appearing[19] to comply with the Corporate Integrity Agreement.

64. Purdue and the Sacklers were well aware of the constraints posed by the Corporate Integrity Agreement. Indeed, during a May 20, 2009 Executive Committee Meeting, the discussion led to whether Purdue should have a single sales force marketing all Purdue products, including OxyContin, or instead to "create a separate Sales Force for Intermezzo (a sleeping pill) that would be comprised of approximately 300 representatives." John Stewart ("Stewart"), the Sacklers' chosen CEO for Purdue at the time, saw an opportunity, and asked if the Corporate Integrity Agreement would apply if Purdue were to launch Intermezzo and another Purdue product, Ryzolt (a branded version of Tramadol, another narcotic painkiller), using the separate sales force. Might the new drug launch fall outside of the Corporate Integrity Agreement? – he asked.[20]

65. It would not, he was told by Bert Weinstein, Purdue's Vice President of Compliance.[21]

66. Given the tension between compliance with the Corporate Integrity Agreement and the desire to sell more OxyContin, Purdue needed help.

---

[19]   As one Purdue executive stated of Purdue's attitude toward the Corporate Integrity Agreement: "They did not listen to their critics and insisted they had just a few isolated problems. After the settlement, they didn't change – the way the sales force was managed and incentivized, everything stayed the same." David Crow, *How Purdue's 'one-two' punch fueled the market for* opioids, FIN. TIMES (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

[20]   Purdue Executive Committee Meeting Notes and Actions, at 2 (May 20, 2009).

[21]   *Id.*

67.    Since Purdue did not have the requisite expertise to address the problems posed by the Corporate Integrity Agreement internally, it hired Publicis to devise a sales and marketing strategy to increase opioid sales in light of the Corporate Integrity Agreement and growing concern about the "concentration of risk" that Purdue's business of selling opioids posed to its owners.

68.    In short, Purdue would pay Publicis for it to devise strategies and plans on how to sell as much OxyContin as it could as quickly as possible, so that the Sacklers could obtain cash to diversify their investment holdings away from Purdue.

69.    Consistent with their plan to dissociate themselves from the company, the Sacklers had appointed Stewart as the CEO of Purdue in 2007.  The Sacklers viewed Stewart as someone loyal to the family.  He had previously worked for a division of Purdue in Canada.  Stewart's job was to assist the Sacklers with the divestiture or eventual orderly wind-down of Purdue.  Stewart was paid more than $25 million for his services to Purdue from 2007 through 2013.

70.    From as early as May 2010 and continuing at least through 2019, Purdue relied upon Publicis to orchestrate its sales and marketing strategy for OxyContin.  The relationship was characterized by ongoing interactions between teams from Publicis and Purdue regarding not only the **creation** of an OxyContin sales strategy, but also its **implementation**.

C.    **Purdue Relies on Publicis to Increase Opioids Consumption and Publicis Aims to Keep Patients on Higher Doses for Longer**

71.    Some of Publicis' earliest work for Purdue was the development of a series of marketing schemes to get patients to titrate up to higher doses of OxyContin and prolong patients' "length of therapy."  These schemes were related; Publicis knew that higher doses increased length of therapy and that prolonging treatment led to tolerance which in turn would lead to even higher doses.  Although Publicis knew that increasing titration and length of therapy increased patients' risk of opioid use disorder, overdose, and death, it also knew these trends were good for Purdue's

bottom line.[22]  From 2012 through 2018, Publicis and Purdue signed Statements of Work for Publicis and have been accused of creating or refreshing marketing campaigns which included targeting and contacting "doctors who had the highest volume of OxyContin prescriptions and encouraging them to increase the dosages for patients."[23]

72.     Publicis developed an internal campaign to get Purdue's sales force to prioritize dosage titration.  Purdue and Publicis used the word "titration" to mean increasing the dose of a patient's opioid prescription.  Purdue focused its marketing campaign on reinforcing the importance of titrating (increasing prescription dosages) directly with prescribers and retained Publicis to execute on both.  Publicis and Purdue intended their internal campaigns to be motivating calls to action for sales representatives to push prescribers to prescribe more and higher doses of Purdue's drugs.

73.     In April 2013, Publicis agreed to deploy an email campaign prompting prescribers to download OxyContin "Savings Cards" – an updated version of the OxyContin "starter coupons" that Purdue had in the 1990s to get thousands of patients on OxyContin.[24]  Publicis charged Purdue about $47,000 for the Savings Cards campaign, a "drop in the bucket" as once a patient took OxyContin for a few months the patient was much less likely to stop.  Publicis knew, or should

---

[22] *See* Barry Meier, *Sackler Scion's Email Reveals Push for High-Dose OxyContin, New Lawsuit Disclosures Claim*, N.Y. TIMES (Jan. 31, 2019), https://www.nytimes.com/2019/01/31/health/opioids-purdue-pharma-sackler.html.

[23] *Iowa to receive $2.5M as part of opioid settlement*, THE GAZETTE (Feb. 6, 2024), https://www.thegazette.com/state-government/capitol-notebook-lawmakers-advance-bill-allowing-iowa-cities-to-cap-rent-costs/.

[24] United States General Accounting Office, *OxyContin Abuse and Diversion and Efforts to Address the Problem*, GAO-04-110, at 23-24 (Dec. 2003), https://www.gao.gov/assets/gao-04-110.pdf (describing OxyContin starter coupons); Mathias Dewatripont & Michel Goldman, *Free Drug Samples and the Opioid Crisis*, 379 New Eng. J. Med. 793, 793 (2018).

have known, that Savings Cards would be a top strategy for keeping patients on OxyContin for longer periods of time.  It was later estimated that the incremental impact of the OxyContin Savings Cards led to more OxyContin prescriptions by April 2014 as the "savings cards" had release dates in January and would not expire until March 31 of the following year, they were designed to eliminate any "disruptions between offer periods."[25]

74.    Later in 2013, in response to a significant decline in average patient doses, Publicis refreshed Purdue's *Individualize the Dose* campaign for OxyContin.  Designed to drive prescribers to move patients to higher doses more quickly, the campaign featured "real life examples" of patients and paired them with one of OxyContin's seven tablet strengths, seemingly allowing prescribers to individualize the dose to their patient.  Due to growing awareness of the risk of opioid use disorder, overdose, and death, Publicis knew that prescribers were prescribing less OxyContin, particularly the most profitable high doses, so it redesigned the *Individualize the Dose* campaign to reverse that trend.[26]

75.    At the end of 2013, Publicis knew, or should have known, what it was undertaking. As early as 2007, U.S. Attorney Brownlee was charging that "Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign" noting that "[i]n the process scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less abuseable, and less addictive

---

[25]  Christine Willmsen, *Suit: Patients Who Used Purdue's Discount Cards Were More Likely To Get Hooked On OxyContin*, WBUR (Feb. 1, 2019), https://www.wbur.org/news/2019/02/01/purdue-oxycontin-savings-cards; Exs. 91-105 to Affidavit in Support of Director's Motion to Dismiss, PPLPC012000433404, https://www.mass.gov/doc/july-16-2019-affidavit-in-support-of-directors-motion-to-dismiss-exhibits-091-105/download (last visited Mar. 8, 2024).

[26]  Exs. 91-105 to Affidavit in Support of Director's Motion to Dismiss, PPLPC002000186925, *supra* n.25.

than other pain medications on the market."[27]  Purdue was aware that CEO Stewart was under pressure and suspected he would be fired.  The source of the pressure was the Sacklers.  And, the focus of that pressure was a relentless demand to sell more drugs and retain more patients.[28]

76.  Publicis recognized that the Sacklers' desperate desire for growing sales was an opportunity for Publicis to profit.  So, Publicis set out to help Purdue and the Sacklers sell more drugs.  Month after month, Publicis signed new statements of work with Purdue, continuing its work to increase average dose and keep patients on opioids longer.  Publicis knew the dangers of Purdue's opioids but instead of emphasizing the risks of OxyContin, Publicis attempted to humanize the brand to engage prescribers and get them to prescribe to more patients, at higher doses, and for longer periods of time.

77.  One way Publicis humanized Purdue and its opioids was through the S.T.A.R.T. campaign's[29] "Patient Case Study Vignettes."  Publicis partnered with Purdue to create patient

---

[27]  David Corn, *Why Eric Holder Represents What's Wrong with Washington*, MOTHER JONES (Jan. 14, 2020), https://www.motherjones.com/politics/2009/01/why-eric-holder-represents-whats-wrong-washington/#:~:text=Even%20in%20the%20face%20of,that%20promoted%20OxyContin%20as%20less; *see also The Purdue Frederick Company, Inc. and Top Executives Plead Guilty to Misbranding OxyContin; Will Pay Over $600 Million*, BIOSPACE (May 11, 2007), https://www.biospace.com/article/releases/the-b-purdue-frederick-company-inc-b-and-top-executives-plead-guilty-to-misbranding-oxycontin-will-pay-over-600-million-/.

[28]  Exs. 91-105 to Affidavit in Support of Director's Motion to Dismiss, PPLPC012000448835-6, *supra* n.25 (includes emails from Mortimer Sackler demanding additional information on lost patients, decline in market and declining sales).

[29]  S.T.A.R.T. "campaign was introduced to assist the ASF representatives in communicating the key elements of appropriate OxyContin titration. It also allows for an easy way to remember the key elements when titrating patients to the appropriate OxyContin dose.  S = Supplement with an immediate-release analgesic, T = Titrate every 1-2 days as needed, A= Adjust the dose by 25%-50%, R = Reassess the patient's analgesia and tolerability throughout the treatment, and T = Tailor the dose based on the reassessment, titrating up or down."  Exs. 91-105 to Affidavit in Support of Director's Motion to Dismiss, PPLPC012000433404, *supra* n.25.

vignettes to get doctors to "increase focus on the appropriate patient" who could be started on OxyContin and titrated to higher doses.[30]  Publicis developed the new patient vignettes to provide "real life" examples for the physician to relate to.  For all three of the patient examples, the "Individualize the Dose" campaign was reinforced and further supported the S.T.A.R.T. principles to increase dosage and, thus, patient retention through increased dependence on higher doses.[31]  Publicis facilitated the delivery of patient vignettes to prescribers, together with savings card information in what were "Patient Essentials Pack[s]" which were provided to prescribers when their patients began to use OxyContin.  When Purdue completed the profitability analysis of the "Patient Essentials Pack[s]" in June 2013, it determined it had a full cost return on investment ("ROI") of 5.7 (*i.e.*, a 570% return).[32]

78.     Publicis knew that Purdue's drugs were dangerous.  In May 2014, in confidential, internal correspondence "Summary of Activities Relating to New Extended Release Opioid Class Labels and Acceptance of Abuse Deterrent Formulations of Opioids" for OxyContin, Purdue executives wrote to Raymond Sackler regarding citizens' petitions that were filed by the Physicians for Responsible Opioid Prescribing ("PROP") who requested the FDA impose daily dosage maximums, add 90-day maximum durations for opioid use, and restrict extended release opioid use to "severe-only" pain.[33]  The correspondence indicated that at the time of Purdue's switch to the new Abuse-Deterrent Formulation ("ADF") in August 2010, "Purdue undertook a

---

[30]   Exs. 91-105 to Affidavit in Support of Director's Motion to Dismiss, PPLPC002000186925, *supra* n.25.

[31]   *Id.*

[32]   *Id*.

[33]   *Id.*, PWG000412143.

broad based strategy using legal, regulatory, and government affairs strategies to attempt to influence the policies around ADF technologies."[34]  In September 2013, Purdue's investment paid off as the FDA denied the PROP's requests and only agreed to modify existing labeling.  Notably, while Purdue's new ADF formulation claimed to have abuse deterrent properties like being crush-resistant or anti-dilution,[35] the formulation did nothing to prevent abuse via swallowing.  And, at the same time, Publicis continued to develop marketing campaigns for Purdue to drive more prescriptions, at higher doses, for longer periods of time.

79.     In 2014, Purdue had Publicis consider strategic initiatives, and how Purdue could capitalize on the top opportunities for oxycodone brands.  Purdue relied on Publicis so much that it was the only agency with whom Purdue shared certain information regarding declining sales of OxyContin.  Publicis suggested Purdue focus on titration.  In response to correspondence regarding declining OxyContin sales, Publicis worked around the clock to develop targeted marketing campaigns and initiatives to combat the decline.  At the end of one such week, Publicis sent Purdue an OxyContin "Financial Tracker" including Statements of Work that totaled 41,767 hours of work – enough to keep twenty people busy full-time for a year.[36]

80.     In August 2014, Publicis staff met and discussed opportunities for Purdue, including projects focused on "patient retention" – strategies designed to keep patients on OxyContin for longer periods of time.  In that meeting, Publicis noted its overall strategy for maintaining its client and circulated internal notes memorializing its proposed strategies.  The notes revealed how Publicis monetized its work for Purdue, right down to the dollar value of a

---

[34]  *Id.*

[35]  *Id.*

[36]  *Id.*

patient: "What is a patient worth?"  Publicis queried whether it needed to disguise or "veil[]" "retention" efforts and instead label them as "patient engagement."  Publicis noted, and, thus knew, that in the past, "Purdue got reprimanded for going after patients too aggressively," a telling reference to Purdue's 2007 federal guilty plea for felony misbranding.  The focus of the meeting was keeping patients on OxyContin for longer, to increase Purdue's ROI, and figuring out what to call Purdue's plan so that Purdue could get away with it without tipping off the authorities.[37]  The theme of Publicis' meeting was clear, it would do whatever was necessary to help Purdue achieve its goal of profits over people.  For Publicis, the only metric that mattered was ROI.

- Patient Retention – "How do we get a 2:1 return on this?"
    - What is a patient worth?
    - What is a monthly script worth?
    - What is the value of getting just *one* more refill?
    - Isn't brand retention so much as overall portfolio retention
- In the beginning, Purdue got reprimanded for going after patients too aggressively
- Hence the focus is more company versus brand oriented; feels more altruistic
- Determine at the patient level what they need for their condition
- Does portfolio retention need to be veiled in a patient engagement program?                    38

81.     Publicis listed that one of the factors for achieving a 2:1 ROI for Purdue was to get the patient to stay on OxyContin for one more month or have the patient fill "just ***one*** more refill."[39]

82.     Each incremental month and each additional pill strength meant more money for Purdue and greater success for Publicis, but for patients, each step up meant greater risk of opioid use disorder, overdose, and death.

83.     Publicis later requested data from Purdue, including a request for Purdue's "average value of a patient, by brand, and by dose."  Publicis wanted to know if Purdue had calculated how

---

[37]   2014-08-07 Purdue Meeting Notes, PUBLICIS-0127877.

[38]   *Id.*

[39]   *Id*.

many dollars a patient was worth to the company, to inform Publicis' work.  Purdue sent data showing that the higher the dose of OxyContin, the longer the length of therapy and indicated to Publicis that these discussions should occur offline.

84.     Publicis analyzed the data from Purdue and concluded that increasing each patient's average length of therapy, especially on extended release formulations, would be more profitable than sales of short acting opioids.

85.     Publicis would then create Purdue's OxyContin Business Plan for the upcoming year and present it to Saeed Motahari ("Motahari"), Purdue's Chief Commercial Officer.[40] Publicis knew that Purdue was facing increasing external pressure to reduce abuse, diversion, and overdose, but nevertheless it wrote that one of the primary objectives was to "maintain positive growth" of new OxyContin prescriptions.  In just three short years, Publicis partnered with the FDA's Center for Drug Evaluation and Research ("CDER") to design a "Search and Rescue" campaign to reach medical practitioners with the highest opioid prescribing rates.[41] Publicis knew patients taking Purdue's opioids faced risk of opioid use disorder, overdose, and death, yet it pushed onward with marketing campaigns to increase prescriptions of Purdue's drugs.

86.     In 2014, Publicis relaunched the titration campaign it had developed for Purdue in 2013.  The goal of the campaign refresh was to determine if titration would lead to an increase in length of therapy with patients who have initiated therapy with OxyContin.  Publicis knew the longer patients were on opioids, the more money Purdue would make and the more likely the

---

[40]   Following his stint at Purdue, Motahari went on to become CEO of disgraced criminal opioid company Insys Therapeutics, Inc.

[41]   Josie Feliz, *Partnership for Drug-Free Kids Announces Relaunch of "Search and Rescue" Opioid Prescriber Education Campaign Website*, PARTNERSHIP TO END ADDICTION (May 15, 2018), https://drugfree.org/newsroom/news-item/partnership-drug-free-kids-announces-relaunch-search-rescue-opioid-prescriber-education-campaign-website/.

patient would become addicted, overdose, and die, yet it framed its campaign as a means to personalize medication to a patient's needs and obtain "good responses" or "better pain relief." Notably, these patient profiles never provided examples where a patient's dosage was titrated down.

87.     Publicis then pitched Purdue on a number of marketing schemes, including its vision to redo Purdue's patient-facing Partners Against Pain website.[42]  Opioid companies like Purdue used unbranded websites, like Partners Against Pain – sites that did not promote a drug by name – to promote prescribing of extended-release opioids as a class which would in turn increase prescriptions for Purdue's branded drugs in that class, like OxyContin.  Noting how the Partners Against Pain website was named in lawsuits, Publicis would start fresh.  Publicis pitched its ability to transform Purdue's communications with patients by claiming to be experts on how to influence consumers to achieve Purdue's goal of extending patients' length of therapy and would launch new programs that were alternatively titled to create direct links to patients.  Disregarding Purdue's "promise" to the FDA that it would not do "[direct-to-consumer] advertising for this dangerous and controversial category of medications (opioids, highly addictive, narcotic painkillers that are highly probe [sic] to abuse, misuse, diversion, addiction and accidental overdose)," Publicis viewed direct engagement with patients as a significant opportunity for its business.  Given its experience with Purdue, Publicis wanted to expand its offerings into patient engagement programs and solidify its position as the lead engagement partner that Purdue worked with.  Publicis believed that if it secured this project with Purdue, it would be a groundbreaking advance in its own patient

---

[42]  Latesha Richards, *Evaluating Two Unbranded Sites: Purdue Pharma's "Partners Against Pain" and Pfizer's "Get Healthy, Stay Healthy*," PM360 (June 24, 2013), https://www.pm360online.com/evaluating-two-unbranded-sites-purdue-pharmas-partners-against-pain-and-pfizers-get-healthy-stay-healthy/.

engagement capabilities, and provide it with extensive bragging rights, amongst others in the industry, thus increasing its own dominance and influence in pharmaceutical marketing.

88.     Although the Patient Retention Program that Publicis pitched never came to fruition, Publicis kept pushing aggressive marketing strategies for Purdue's branded drugs – OxyContin, Butrans, and Hysingla – in exchange for millions of dollars in annual contracts.  When Publicis made these pitches to target doctors, pharmacists, and payers on Purdue's behalf, it understood that the marketing tools it used to sell more opioids were more about persuasion than education.

89.     Publicis targeted any audience that could or would influence the distribution of prescription opioids so that no step in the process from experiencing and expressing pain to a prescriber, to obtaining a prescription, to having that prescription approved and filled, stood as an obstacle between patients and their taking more or higher doses of Purdue's drugs.

90.     Purdue's objective was so aggressive that in the summer of 2015, Purdue arranged for the Publicis marketing team to join Purdue sales representatives on face-to-face visits with doctors to promote OxyContin.  Publicis' marketing team members went into the field alongside Purdue sales representatives and watched as they promoted OxyContin to doctors and heard firsthand why doctors would or would not prescribe OxyContin.  Publicis would then use the information gathered from these sales representative ride-alongs to create targeted marketing schemes to encourage sales representatives to get doctors to prescribe more OxyContin.

91.     However, Publicis' ongoing efforts were not limited to doctors and prescribers.  To help facilitate a patient's access to Purdue's drugs, Publicis targeted pharmacy and therapeutic committees ("P&T Committees") of major pharmacy benefit managers ("PBMs") to enter into communications with them.  On information and belief, Publicis directly communicated with P&T

Committees and delivered marketing information, thereby, influencing the decisions that established, continued, or expanded coverage of Purdue's drugs on a PBM's formularies.

92.     Defendant's communications and misrepresentations regarding Purdue's opioids were calculated to reach Plaintiff and other third-party payors ("TPPs") through their PBMs to positively influence the placement and status of Purdue opioids on Plaintiff's formularies.  Positive placement on Plaintiff's or another TPPs' formularies would serve to get quicker and easier approval for a prescription's coverage, thus, increasing patients' access to Purdue's drugs. Purdue's desperate efforts to sell more drugs paid off and the Sacklers, who Publicis had described as "looming," made it onto Forbes' list of the richest families in the world.  OxyContin sales had put Purdue's Sackler family on the top of the Forbes richest dynasties list.[43]

93.     By 2016, Purdue recognized that the expansion of OxyContin sales was the result of Publicis' marketing campaigns to increase doses and length of therapy.   In March 2016, recognizing Publicis' role in OxyContin's boom, Purdue hired Publicis to do "everything it had done for OxyContin for Butrans."  Publicis celebrated the award of the Butrans account.  A few weeks later, John Dwyer ("Dwyer") summed it up to his team, emphasizing how Publicis provided strategy and engagement to Purdue:

> And so ultimately, 3 weeks ago when the client told us that he was going to move the rest of the Butrans business over to Razorfish Health, the reason he said he was doing it was because he wanted us to replicate exactly everything we did last year on OxyContin.  The creative campaign refresh, the vis aid that far outshone the Butrans and Hysingla ones which were done by another agency, the strategic planning we brought them for the new competitors who are coming, and the overall revitalization of a brand that needed a boost as it went into its [sic] 20th.  He said,

---

[43]  Chloe Sorvino, *The Newcomers To America's Richest Families 2015: Clans Behind OxyContin, Tootsie Roll, Grey Goose*, FORBES (July 1, 2915), https://www.forbes.com/sites/chloesorvino/2015/07/01/the-newcomers-to-americas-richest-families-2015-clans-behind-oxycontin-tootsie-roll-grey-goose/?sh=32d114aa325a.

"We want more like that. We want you to do the exact same thing this year, but now with Butrans."

Dwyer continued, "It's an example of what we can do when we manage the client's biz like its [sic] our own."[44]

94.     Days later, Purdue put Hysingla out for bid, and in May 2016, awarded the account to Publicis.  Publicis executive vice president Karl Tiedemann was ecstatic about the news and the "amazing relationship" between the companies.  Quoting a Purdue employee, he noted this was "the final piece and **we now own Purdue**."

95.     Publicis went on to apply the same titration messages that had been so successful with OxyContin to patient vignettes for Hysingla, and Purdue loved it.  Dwyer and Christina Ceniza ("Ceniza") discussed how Publicis took over the creation of the Hysingla patient vignettes from a competitor that was coming up short, and anticipated Purdue's every need.  Ceniza described a Purdue marketing staffer's reaction to Publicis work: "you mean i can have my cake and eat it, too?! and we were like YES!!"[45]

---

[44]   Erik Oster, *Former Razorfish Health Account Director Quoted Gandhi in Memo on Winning Butrans Due to Strength of OxyContin Work*, AGENCYSPY (May 10, 2021), https://www.adweek.com/agencyspy/former-razorfish-health-account-director-quoted-gandhi-in-memo-on-winning-butrans-due-to-strength-of-oxycontin-work/.

[45]   2016-03-18 email from Dwyer, "Conversation with Christina Ceniza," PUBLICIS-0450259.

Christina Ceniza [4:55 PM]:
  OH MAN
  when he saw the headline
John Dwyer [4:55 PM]:
  damn
Christina Ceniza [4:55 PM]:
  and every time he would say he wanted something else
  we were like
  oh just wait
  we have more
John Dwyer [4:55 PM]:
  awesome
  "But wait, there's more…"
Christina Ceniza [4:55 PM]:
  yes excatly
  and at the end he was like
  you mean i can have my cake and eat it, too?!
  and we were like YES!!
John Dwyer [4:56 PM]:
  great great job

96.     Fulfilling its promise to Purdue, when drafting the Hysingla patient profiles, Publicis staff made sure to titrate them up to higher doses when converting patients from an immediate-release drug to Hysingla.

97.     Publicis understood that once patients were on Purdue's opioids, they were often hooked and on their way to higher and higher doses.  Publicis knew that discontinuation was usually an irrelevant subject matter as once a patient was on an ERO [Extended- Release Opiate], the only way was up.

D.     **Purdue Develops Electronic Media Campaigns Designed to Recommend Purdue's Opioids for Diseases for Which They Are Not Indicated**

98.     Throughout its work, Publicis knew that none of Purdue's opioids were approved to treat specific diseases and that their statements and presentations to prescribers suggesting otherwise were improper and misleading.

99.     Nevertheless, for several years, Publicis developed and implemented "Conditions Campaigns" designed to infiltrate web searches on diseases for which opioids are not indicated –

namely, low back pain, cancer pain, and osteoarthritis pain – to push prescribers into prescribing Purdue's opioids.[46]

100.    Internally Publicis recognized the success of the "Conditions Campaigns."  In 2013, Publicis staff boasted, "The Campaigns pertaining to Conditions were the most successful out of last year's [Search Engine Marketing] strategy and [had] resulted in 25,548 Clicks, driving the most visits to the PurdueHCP site."[47]



101.    Seeking to expand on the success of the OxyContin Conditions Campaigns, in 2014, Publicis proposed expanding the conditions to include multiple sclerosis, trigeminal neuralgia, and spinal cord injury, but rather than use search words associated with diseases for

---

[46]    *See* David Ovalle, *Ad agency tied to Purdue Pharma settles opioid claims for $350 million*, WASH. POST (FEB. 1, 2024), https://www.washingtonpost.com/health/2024/02/01/opioids-oxycontin-purdue-publicis-health-lawsuit/.

[47]    2014-07-14 email from Michael Caruso, PUBLICIS-0473520, attaching presentation, "2013 Top Performers – Campaigns & Ads, Top Ads" PUBLICIS-0473522 at -522.

which OxyContin is not indicated, Publicis chose to modify the resulting ads to refer ambiguously to "That Condition," as shown below.

102.    Rather than discontinuing the Conditions Campaign, due to liability concerns, Publicis chose to modify the resulting ads to refer ambiguously to "That Condition[,]" as shown below.[48]

PurdueHCP Treatment Info
Help Your Patients With That
Condition. Sign Up Today!
www.PurdueHCP.com

E.    **Publicis Designs Marketing Strategies to Combat Hesitation Surrounding Opiates as a Decline in OxyContin Sales Threatens Purdue's Profits**

103.    By 2015, awareness and concern regarding the opioid crisis was growing among prescribers.  To counter the skepticism, Publicis developed a marketing strategy instructing Purdue's marketing team to adopt a "value proposition" for OxyContin – a reason why prescribers should consider the drug to be a safe and responsible choice for their patients, in spite of their appropriate caution.  While Publicis wrote about OxyContin being the only opioid to address the pain management needs of both patients (efficacy and dosing flexibility) and society (proven abuse deterrent properties) it knew that OxyContin's formulation had nothing to deter abuse or addiction.

1.    **Publicis Works to Deceive the Public**

104.    In October 2014, Purdue met with Publicis to revise its "Outward Facing Strategy" and content for its corporate website.  Publicis listed "responsible," "productive," and "good corporate citizen," as the top three takeaways they would want a visitor to the website to associate with Purdue.  Publicis and Purdue strategized to develop a new corporate tagline – a short, pithy

---

[48]    PurdueHCP (OxyContin) Paid Search MRL Submission, PUBLICIS-0035882 at -898.

phrase that the website audience would associate with Purdue. To improve Purdue's corporate reputation, Publicis knew Purdue would have to ditch its current corporate mantra, "profitable growth." Regardless of what Publicis and Purdue would eventually tell the public, both knew that Purdue was set on selling more OxyContin.

105. Publicis understood that managing Purdue's reputation and making Purdue appear socially responsible was the key to selling more OxyContin, and OxyContin made up 90% of Purdue's revenue.

106. As part of Publicis' efforts to revamp Purdue's image, Publicis (via Razorfish Health) launched the now-defunct website TeamAgainstOpioidAbuse.com.[49] The website was purportedly "designed to help healthcare professionals and laypeople alike learn about different abuse-deterrent technologies and how they can help in the reduction of misuse and abuse of opioids."[50]

107. The unbranded website was full of misinformation regarding the effectiveness of abuse-deterrent properties of certain opioid formulations, including Purdue's reformulated OxyContin and Hysingla.[51] As explained by Purdue's Vice President of Health Policy, Dr. David Haddox, "The concept is that we're all part of a team."

---

[49] Kevin McCaffrey, *Purdue debuts opioid-abuse resource*, MED. MKTG. & MEDIA (Aug. 17, 2015), https://www.mmm-online.com/home/channel/campaigns/purdue-debuts-opioid-abuse-resource/.

[50] *Purdue Pharma L.P. Launches TeamAgainstOpioidAbuse.com*, FIERCE PHARMA, (Aug. 20, 2015, https://www.fiercepharma.com/marketing/purdue-pharma-l-p-launches-teamagainstopioidabuse-com.

[51] At the time only three ADFs were available on the market OxyContin (Purdue), Hysingla (Purdue) and Embeda (Pfizer).

108.    Two months later, in an effort to manage Purdue's growing public image problem, Publicis partnered with Purdue to reach an even broader audience in an attempt to garner a favorable public opinion.  Knowing that keeping a positive image was vital to OxyContin sales and Purdue's profits, Publicis scripted a 60-second television commercial for Purdue CEO Mark Timney ("Timney").  Timney claimed that Purdue was doing everything [it could] to reverse this public health problem.

109.    In November 2015, Purdue partnered with the National Sheriffs' Association to provide free-of-charge naloxone overdose kits and training to law enforcement agencies across the country.  Timney again boasted that Purdue was committed to combatting opioid abuse by stating that "[f]or more than a decade we've worked with law enforcement to combat prescription drug abuse," and Purdue was "proud to continue that commitment by supporting this lifesaving program."[52]  Nothing could have been further from the truth.

### 2.    Publicis Works to Deceive Doctors

110.    Despite its messaging campaigns, Publicis knew that some prescribers remained skeptical of the safety of OxyContin.  In 2016, Publicis collaborated with Purdue's marketing team, to script a training video for Purdue sales representatives titled "The Handler."  The video advised Purdue sales representatives to model themselves on "Ken," a fictional yet ideal sales representative.  In the mock-up for the video, Publicis set the stage for Ken's introduction: "Eye of the Tiger" plays as a full-body shot of Ken, arms folded across his chest, spins 360-degrees and text flies onto the screen noting that Ken "faces challenging objections from prescribers head-on,"

---

[52]    *Purdue Pharma Grant*, Nat'l Sheriff's Assoc., https://www.sheriffs.org/purdue-pharma-grant (last visited Mar. 8, 2024).

covers a territory of "100 square miles[,]" and even included his "[f]avorite pre-detail coffee drink[,]" a "[t]riple-shot brevi latte."[53]



**Frame 6:**

**Visuals/Music**

High-tech, full-body shot of TBM with 360-degree rotations. Spotlight on sharply dressed TBM with arms crossed in front.

High-tech graphics fly onto screen:
• **Territory covered: 100 square miles**
• **Warm-up soundtrack: "Eye of the Tiger"**
• **Favorite pre-detail coffee drink: Triple-shot brevi latte**

**Dialogue**

[Experienced HCP Voiceover]
Take a look at Ken: He's dressed for success. He exudes confidence. His attitude defines determination.

Source: "'The Handler' – Objection Handling," PUBLICIS 0007493 at -494.

111.    Publicis scripted Ken to push back against doctors' concerns about addiction. When asked about the risk of addiction, Ken would reply that "the potential for these risks should not prevent the proper management of pain in any given patient."  Ken downplayed the addiction risks and assured doctors that they were manageable.  By creating Ken, the fictitious ideal sales representative, Publicis was training sales representatives on tactics and ideas to adopt and use for

---

[53]    "'The Handler' – Objection Handling," PUBLICIS-0007493-494.

their visits with prescribers.  Ken was scripted to quote selectively from the Full Prescribing Information, omitting reference to "intensive monitoring" of patients at increased risk of opioid use disorder, a process that would cause doctors to hesitate before prescribing OxyContin.  Publicis and Purdue wanted Purdue sales representatives across the country, to follow "Ken's" example to mislead doctors about the risks of OxyContin so they would prescribe more of it.

112.    Along with "Ken," Publicis developed other "Objection Handler" content designed to overcome any objections to prescribing OxyContin.  In other content development workshops, Publicis devised sample responses for sales representatives that would help them to overcome prescriber objections.  Publicis also taught Purdue sales representatives to deliver misleading messages that suggested the blame and stigma of opioid use disorder be placed on patients rather than on the addictiveness of Purdue's drugs – drugs that Publicis and Purdue knew could be abused and caused opioid use disorder even when simply swallowed and taken as directed.

### 3.    Publicis Works to Deceive Patients

113.    Publicis knew doctors were not the only hurdle, as growing awareness of the opioid epidemic grew, patients were also hesitating to accept prescriptions for OxyContin.  To combat that trend, Publicis told Purdue to use physicians to ease patients' worries and use direct patient education efforts to get patients comfortable with taking OxyContin.  After analyzing recordings of conversations between doctors and patients, Verilogue advised Purdue that it should help physicians proactively address patient pushback against opioids by instructing them to educate and reassure patients on the importance of balance in pain management and the physician's role in it.

### 4.    Publicis Works to Deceive Payors

114.    As set forth above, Defendant's communications with P&T Committees concerning Purdue's prescription opioids informed formulary decisions for their TPP clients, including Plaintiff.  Indeed, as Plaintiff was the payor for Purdue's prescription opioids, Defendant's

communications and misrepresentations targeted Plaintiff through the agents that established Plaintiff's formularies. Defendant engaged in concerted and deceptive efforts to obtain positive placement on a PBMs' formularies, and, thereby, deceived Plaintiff and other TPPs into approving coverage and payment for Purdue's opioid drugs.

F.    **Publicis Counters Public Health Efforts to Stop the Opioid Epidemic to Protect Purdue's Profits**

115.    In March 2016, the Centers for Disease Control and Prevention ("CDC") issued a Guideline for Prescribing Opioids for Chronic Pain ("CDC Guidelines"), a set of guidelines to protect patients from the overprescribing of opioids and the associated risks of opioid use disorder. Publicis jumped on assessing the situation for Purdue. After a month of in-depth analysis, Publicis delivered a detailed report on the implications of the CDC Guidelines, declaring each of the CDC's 12 guidelines a "threat" to Purdue's opioid profits.[54]

116.    Publicis concluded that the safety guidelines the CDC determined would be good for patients would be bad for Publicis' opioid marketing. At the height of the epidemic, when hundreds of thousands had already been killed and the nation was trying to save people's lives, Publicis worried about the possibility that doctors might prescribe fewer opioids, or lower doses, or fewer pills in a prescription, or that patients might choose safer medicines instead.

117.    The biggest hit would be to high dose opioids, prescriptions at more than 90 morphine milligram equivalents ("MME") per day. Publicis knew that Purdue specialized in dangerous, high dose prescriptions. While just over 20% of all extended-release opioids would be affected by the guidelines limiting high doses, *nearly half* of all OxyContin prescriptions – more than two million prescriptions across the country – exceeded the dangerous 90 MME threshold. A

---

[54] *See CDC Guidelines Guideline for Prescribing Opioids for Chronic Pain – United States 2016*, CDC (Mar. 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

patient prescribed the OxyContin 80 mg pill, every 12 hours per the indication for the drug, received 240 MME per day, nearly three times the CDC Guidelines. Publicis knew that the CDC Guidelines would save lives but it proceeded with its marketing efforts to fight back against them.

118.     Publicis noted the CDC Guidelines to prescribe the "lowest effective dosage" as a significant threat to Purdue's high doses. Publicis knew that higher, more dangerous doses of Purdue's drugs meant more profits for Purdue. Publicis knew that the success of its 2013 refresh of Purdue's "Individualize the Dose campaign" would be measured by whether there was shift away from the trend of lower doses of OxyContin towards higher doses. Publicis was also aware that the CDC's recommendations to proceed "cautiously" and "carefully justify" high dose OxyContin prescriptions would undermine Publicis' efforts to get doctors to write higher dose OxyContin prescriptions.

119.     In response, Publicis told Purdue to focus its messaging on advising doctors to "[s]tart low, go slow" and "[r]eassess patient's therapy at every step" and developed marketing campaigns focused around these themes. While on the surface, these messages appeared to be about patient evaluation, Publicis was actually measuring a campaign's success by how much it would lead to increases in a patient's dosage.[55]

---

[55]  2016-04-04 presentation, *Assessment of CDC Opioid Guideline and FDA IRO Label Requirements*, PUBLICIS-0015534, at slide 7.



Source: 2016-04-04 presentation, "Assessment of CDC Opioid Guideline and FDA IRO Label Requirements," PUBLICIS-0015534 at slide 7.

120.   To combat the CDC's recommendation that practitioners start patients on less dangerous immediate-release opioids instead of extended-release opioids like OxyContin, Publicis created marketing pieces showing extended-release opioids as appropriate for opioid-naïve patients and told Purdue to clarify the definition of opioid-naïve to exclude patients who had taken any opioids, at all, in the last six months.

121.   To counter the negative impact on sales from the CDC's call for prescribers to review a patient's drug history in state prescription drug monitoring programs ("PDMPs"), Publicis urged Purdue to control the narrative and warn doctors through the OxyContin website and marketing emails that they needed to balance the information from the PDMPs with whether "[the] patient would continue to experience pain."[56]

---

[56]   *Id.*



*Purdue internal strategy presentation from 2012*

122.    Publicis' direction for how to counter the CDC Guidelines was worth millions, if not billions, of dollars to Purdue.  Purdue studied prescription data to calculate how much profit it would lose if doctors followed the CDC's advice.[57]

### G.    Publicis Identifies Growth Opportunities for OxyContin Sales Both in and out of the Current Market

123.    In January 2019, the Commonwealth of Massachusetts alleged that Purdue and members of the Sackler family worked with McKinsey & Company ("McKinsey"), a management consulting firm, to devise a plan to increase OxyContin sales by "direct[ing] sales reps to the most prolific opioid prescribers," including those who write "'25 times as many OxyContin scripts' as less prolific prescribers. '"[58]

---

[57]  2012-08-14 OxyContin ACAM Presentation, PWG00062610, at slide 28.

[58]  First Amended Complaint and Jury Demand, *Commonwealth of Massachusetts v. Purdue Pharma L.P.*, No. 1884-cv-01808-BLS2 (Suffolk Super. Ct. Jan. 31, 2019), https://www.mass.gov/files/documents/2019/07/11/43_01%20First%20 Amended%20Complaint%20filed%2001-31-2019_0.pdf.

124.    In October 2020, members of the Sackler family entered a $225 million civil settlement with the DOJ for knowingly causing the submission of false and fraudulent claims to federal health care benefit programs.  As part of that resolution, the DOJ found that:

> from at least 2013 through 2018, Purdue developed an aggressive marketing program that focused on detailing over 100,000 doctors and nurse practitioners nationwide each year, including thousands of prescribers that the Named Sacklers knew or should have known were prescribing opioids that were not always for a medically accepted indication; were sometimes unsafe, ineffective, and medically unnecessary; and that were sometimes diverted for uses that lacked a legitimate medical purpose.  By 2013, Purdue intensified its detailing of the very highest-volume prescribers, *i.e.*, those writing "25 times as many OxyContin scripts" as their similarly situated peers, because Purdue and the Named Sacklers knew that Purdue's detailing was highly effective in causing these prescribers to write more prescriptions for Purdue's opioids.  This strategy, referred to as the "Evolve to Excellence" or "E2E" program, was approved by the Named Sacklers.[59]

125.    In February 2021, McKinsey settled allegations brought by 53 U.S. states and territories that McKinsey had violated states' consumer protection laws, including by developing "Evolve 2 Excellence," also known as "E2E": a marketing plan to "focus sales calls on high-volume opioid prescribers, including those who wrote as many as 25 times as many OxyContin scripts as their lower volume counterparts."

126.    Despite knowing about Purdue's 2007 guilty plea for felony misbranding, Publicis, like McKinsey, worked with Purdue to target prolific prescribers and it provided the strategic backbone of OxyContin marketing operations including E2E.  Even as opioid overdose deaths across the country soared, Publicis worked diligently to advance E2E and the scheme to further increase OxyContin sales, as described herein.

---

[59]    Addendum A to Settlement Agreement, ¶¶4-5, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. Nov. 18, 2020), ECF No. 1828-3, https://www.justice.gov/opa/press-release/file/1329736/download.

### 1. Publicis Targets Prolific Prescribers

127. Publicis, like Purdue and McKinsey, divided prescribers into deciles and ranked them by total number of OxyContin prescriptions written by each prescriber. Publicis used this ranking of prescribers in its OxyContin marketing plans to advise Purdue on how to target and focus its marketing team's efforts to get doctors to prescribe more OxyContin, to more patients, in higher doses. Publicis knew that targeting and focusing on the highest decile prescribers would maximize Purdue's market opportunity, as high decile prescribers wrote many times the number of OxyContin scripts than lower decile prescribers. In its 2014 OxyContin Marketing Plan, Publicis instructed Purdue to target prescribers who were new to prescribing OxyContin, but were beginning to prescribe a lot of it, relative to their peers (high "new-to-brand" or "NBRx" prescribers). Publicis wanted Purdue to focus its sales efforts by sending sales representatives to both high-decile prescribers and "High-decile NBRx HCPs" up to three times a month to convince prescribers to switch their patients to OxyContin.[60]

---

[60] 2014-03-19 *OxyContin Tablets: Annual Marketing Plan*, PUBLICIS-0048894 at -911.

- **Prescribers**

In 2012: 209,066 healthcare providers (HCP) wrote at least one prescription for OxyContin. For the first 6 months of 2013: 165,137 HCPs wrote at least one prescription for OxyContin.

**January – July 2013 Prescribers**

| TRx Decile | # Physicians | % Physicians | # Rx | Mean Rx / Physician/Month |
|---|---|---|---|---|
| 10 | 358 | 0.2% | 617,887 | 246.6 |
| 9 | 778 | 0.5% | 617,624 | 113.4 |
| 8 | 1,300 | 0.8% | 617,149 | 67.8 |
| 7 | 2,182 | 1.4% | 617,248 | 40.4 |
| 6 | 3,613 | 2.3% | 617,056 | 24.4 |
| 5 | 5,668 | 3.5% | 617,075 | 15.6 |
| 4 | 8,668 | 5.4% | 617,056 | 10.2 |
| 3 | 13,636 | 8.5% | 617,048 | 6.5 |
| 2 | 24,399 | 15.2% | 617,331 | 3.6 |
| 1 | 99,825 | 62.2% | 620,667 | 0.9 |

Source: "2014 OxyContin Tablets: Annual Marketing Plan," PUBLICIS-0048894 at -911.

128.    In planning for 2015, one of Publicis' main goals was to help Purdue meet its aggressive budget for OxyContin sales by increasing "new patient starts."  Publicis worked with Purdue's sales representatives to retain new patients by devising messages and strategies to get prescribers to switch patients on immediate-release oxycodone to extended-release OxyContin.[61]

---

[61]    2014-11-14 email from Jonathan Gough, PUBLICIS-0049335, attaching presentation, *OxyContin 2015 Tactical Planning*, PUBLICIS-0049336, at slide 3.



129.    For 2015, Publicis advised Purdue that focusing on prolific prescribers would be a $1.3 billion opportunity.[62]

---

[62]   2014-11-14 email from Jonathan Gough, PUBLICIS-0049335, attaching presentation, *OxyContin 2015 Tactical Planning*, PUBLICIS-0049336, at slide 2.



Source: "OxyContin 2015 Tactical Planning." PUBLICIS-0049336 at slide 8.

## 2.    Publicis Seeks to Influence No-See Prescribers

130.    That same year, Publicis added prescribers in "no-see" hospitals[63] to Purdue's top priority group of prescribers for OxyContin marketing.  Publicis worked with Purdue to target prescribers at these large no-see hospitals and treatment groups, sometimes called "integrated delivery networks" or "IDNs" as an untapped marketing opportunity.  Publicis worked with Purdue on the design and implementation of call centers to dial prescribers at no-see IDNs and convince them to prescribe OxyContin, as well as other tactics to reach targets that Purdue sales representatives could not.  Publicis developed a web-based virtual presentation for call center operators to use in "HCP education" and out-reach, including the principles of the *Reassess At Every Step* campaign, designed to get prescribers to put patients on higher and higher doses of

---

[63]   Hospitals where pharmaceutical sales representatives are prohibited.

OxyContin, and savings cards, designed to keep patients on OxyContin for longer and longer periods of time. Publicis also continued to promote OxyContin by emails to prescribers and to track how prescribers at each hospital responded to its marketing.

131. In 2015, after Publicis shadowed Purdue sales representatives promoting opioids to doctors, Publicis recommended that Purdue develop a new handout for doctors that would help to identify which portions of their patient populations were eligible for additional insurance programs. Publicis also further engaged it targeted email campaigns by sending messages both to an overall list of "OxyContin Targets" and to "Smaller Sublists (including state specific HCPs)." Publicis' ability to directly market to its intended targets – with its ability to drive up opioid prescriptions – was what Publicis sold to Purdue.

### 3. Publicis Aims to Increase Prescribers by Targeting Nurse Practitioners and Physician Assistants

132. Publicis understood that to increase prescriptions it would need to target more than doctors and so it took to targeting everyone with access to a prescription pad including nurse practitioners and physician assistants ("NPs" and "PAs," respectively). Publicis emphasized that NPs and PAs would play an important role in continuing to drive more and higher dose OxyContin scripts. Publicis would later exclaim that these efforts led to a significant increase in additional prescriptions for Purdue's drugs within the first 12 months of deployment.

133. In 2017, NPs and PAs continued to be a focus of Publicis' marketing plan for Purdue because Publicis knew that, even as OxyContin scripts were declining overall, NPs and PAs were growing provider segment that could help offset some of the decline from PCPs. Publicis pushed Purdue to contract with its Publicis Touchpoint Solutions agency to deploy clinical nurse educators "trained on the Purdue sales force platform for integrated call planning and tracking" to target NPs and PAs on opioid prescribing, "help [them] understand and implement"

treatment plans, and overcome challenges to patient adherence. Publicis knew that patient adherence was about keeping patients on OxyContin for longer and longer. Publicis' recommendation that Purdue hire Publicis Touchpoint Solutions was also consistent with its *Power of One* approach.[64]

134. For years, Publicis relied on its strategy of focusing on prolific prescribers, including NPs and PAs, to continue to increase OxyContin sales. "Over 10 years, Purdue made 63,445 sales calls to nurse practitioners, more than to any other single specialty, and an additional 20,704 sales calls to PAs."[65]

135. As awareness of the opioid epidemic grew, Publicis refined its targeting to focus on prolific prescribers it believed would continue to prescribe OxyContin. Publicis categorized these prescribers as "motivated believers" and "brand loyalists." Publicis' defined "motivated believers" as prolific prescribers, individuals who were convinced that opioid medication is essential to the treatment of the chronic pain patients and that to deny access to such medication was inhumane. These prescribers believed and recognized OxyContin as a leading FDA-recognized Opioid with Abuse Deterrent Properties. These "motivated believers" were not alone and their beliefs were only further supported by articles like those published by the AMA JOURNAL OF ETHICS, which applauded Purdue for its abuse deterrent reformulation of OxyContin.[66] "Brand

---

[64] PUBLICIS GROUPE, *2015 Registration Document, Annual Financial Report*, https://www.publicisgroupe.com/sites/default/files/investors-document/8019-en.pdf.

[65] Kristi L. Nelson, *Purdue targeted nurse practitioners, PAs, but doctors had to sign off on all prescriptions*, KNOX NEWS (Aug. 18, 2018), https://www.knoxnews.com/story/news/health/2018/08/19/opioid-epidemic-lawsuit-purdue-pharma-oxycontin/1016809002/.

[66] *See* Gary M. Reisfield, M.D., *OxyContin, the FDA, and Drug Control*, AMA J. OF ETHICS (Apr. 2014), https://journalofethics.ama-assn.org/article/oxycontin-fda-and-drug-control/2014-04 ("Purdue Pharma, the manufacturer of OxyContin, seems to have produced a success, and the FDA's decision to not accept abbreviated new drug applications for generics based on the original

loyalists" were prolific prescribers who would stick with OxyContin despite the climate of growing concern over its abuse potential. Publicis targeted both groups with marketing materials that validated their prescribing behaviors, helped them to overcome concerns about the abuse potential of Purdue's drugs, and created a cohort of very profitable prescribers who would stick with Purdue despite the increasing pressures and concerns over the growing opioid epidemic.

136.    In a creative attempt to reach additional prescribers, Publicis began to work with **regulators** on their own opioid marketing campaigns. In 2018, Razorfish Health (Publicis) partnered with the CDER to design the "Search and Rescue" campaign, to make innovative "use of optimized search and direct email to reach family physicians, physician assistants and nurse practitioners, and in states with the highest opioid prescribing rates."[67]  By sticking with Purdue while engaging prescribers, Publicis knew and intended these prescribers to prescribe more OxyContin.

### 4.    Publicis Goes Beyond Purdue to Grow the Opioid Market

137.    Seeking to expand the class of drugs of prescription opioids, Publicis engaged in "unbranded" marketing. While "unbranded" opioid marketing would not promote a particular brand of opioid, it would promote prescription opiates as a class worthy of ever increased prescription, and Publicis was great at it.

138.    If one thinks of the entire opioid market as a pie, each individual brand (as well as generic formulations) would comprise individual slices. Crucially, **even if** an individual product's

---

OxyContin formula appears to have rewarded Purdue's effort. Perhaps the OxyContin decision will serve as an incentive for other opioid manufacturers to pursue abuse-deterrent features for their most powerful opioids").

[67]    *See* Feliz, *supra* n.41.

market share does not change, that portion can grow in value if the *entire* market grows. The larger the pie, the larger the slice.

139. The long-term goal was to "make the whole pie bigger, not only for us, but for our competitors as well," a Purdue executive explained in a 2000 speech.[68]

### H. Publicis' Efforts Extended OxyContin's Lifespan and Exponentially Expanded the Opioids Epidemic

140. Purdue and the Sacklers got what they wanted out of Publicis. Between the years of 2010 through 2019, Purdue was able to continue selling OxyContin despite a guilty plea, despite restrictions in a Corporate Integrity Agreement, and despite growing public awareness and concern over the dangers of opioid prescriptions. Publicis played a vital role in managing Purdue's image and training its sales representatives to proceed with Purdue's sales objective overcoming objections, bad publicity, and warnings from the CDC. In almost a decade of service to Purdue and the Sacklers, Publicis assisted in distributing enormous profits to Purdue and the Sacklers.

141. These distributions would not have been possible without Publicis' work to increase OxyContin sales.

142. With Publicis' counsel and collaboration, OxyContin would reach its all-time peak in 2013.[69] Notwithstanding a decline in OxyContin sales given the increase awareness related to the opioid epidemic Publicis efforts added a boost to OxyContin sales and proliferated the

---

[68] Sari Horwitz, et al., *Inside the opioid industry's marketing machine*," WASH. POST (Dec. 6, 2019), https://www.washingtonpost.com/graphics/2019/investigations/opioid-marketing/.

[69] Phil McCausland & Tracy Connor, *OxyContin maker Purdue to stop promoting opioids in light of epidemic*, NBC NEWS (Feb. 10, 2018), https://www.nbcnews.com/storyline/americas-heroin-epidemic/oxycontin-maker-purdue-stop-promoting-opioids-light-epidemic-n846726.

prominence of OxyContin until its eventual unraveling in 2018, and Purdue's decision, in the end, to cease marketing the drug.[70]

I.    **Publicis Knew**

143.    In May 2015, Publicis staff Ceniza, Linda Ketchum-Pompili ("Ketchum-Pompili"), and Bruce Rinderman ("Rinderman") had extraordinary correspondence about OxyContin and opioid use disorder.  Ceniza, Ketchum-Pompili, and Rinderman were designing marketing messages about how the new crush-resistant formulation of OxyContin reduced opioid use disorder, and planned to use the results of the National Survey on Drug Use and Health on illicit drug use among persons aged 12 or older for years 2002-2013 to support Publicis' prospective claims about the crush-resistant formulation.  But Rinderman wrote Ceniza in alarm, attaching the National Survey data with his annotations in red.  "Am I missing something or is there no story here?" he wrote, adding, "Please take a look at my markups (attached) and let's chat when you have a sec."  The data clearly indicated that the number of persons using OxyContin illicitly continued to climb even after Purdue launched its crush-resistant reformulation in 2010.  Ceniza replied to Rinderman:

> Ugh – no you're right.  I was trying to figure out if maybe the % of OXC to overall illicit use of pain killers went down, but it didn't.  Maybe we can set up some time with Linda to talk through possible angles since she did a lot of leg work on lit search?  Even if we can't find the data, we can craft the message and tell the Brand team what we WANT to say and see if their Medical Services group can come up with anything to support it?[71]

---

[70]    *Id.*

[71]    2015-05-04 email from Ceniza, PUBLICIS-0161669.

140325
Table 7.1A – Types of Illicit Drug Use in Lifetime among Persons Aged 12 or Older: Numbers in Thousands, 2002-2013

| Drug | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ILLICIT DRUGS | 108,255 | 110,205 | 110,037 | 112,085 | 111,747 | 114,509 | 117,815 | 119,259 | 119,933 | 121,078 | 124,808 | 127,458 |
| Marijuana and Hashish | 94,946 | 96,611 | 96,772 | 97,545 | 97,770 | 100,737 | 102,857 | 104,950 | 106,613 | 107,842 | 111,239 | 114,712 |
| Cocaine | 33,910 | 34,891 | 34,153 | 33,673 | 35,303 | 35,947 | 36,916 | 36,742 | 37,361 | 36,921 | 37,688 | 37,634 |
| Crack | 8,802 | 7,949 | 7,840 | 7,928 | 8,559 | 8,615 | 8,454 | 8,390 | 9,208 | 1,214 | 9,013 | 8,870 |
| Heroin | 3,668 | 3,744 | 3,145 | 3,534 | 3,788 | 3,806 | 3,795 | 3,680 | 4,344 | 4,162 | 4,565 | 4,812 |
| Hallucinogens | 34,314 | 34,363 | 34,333 | 33,728 | 35,299 | 34,278 | 36,064 | 37,404 | 37,544 | 36,362 | 37,908 | 39,736 |
| LSD | 24,516 | 24,424 | 23,398 | 22,433 | 23,365 | 22,720 | 23,604 | 23,714 | 23,375 | 23,000 | 23,735 | 24,270 |
| PCP | 7,418 | 7,307 | 6,762 | 6,903 | 6,633 | 6,179 | 6,657 | 6,271 | 6,255 | 6,103 | 6,552 | 6,662 |
| Ecstasy | 10,150 | 10,904 | 11,130 | 11,495 | 12,284 | 12,418 | 12,647 | 14,290 | 15,929 | 14,570 | 16,162 | 17,815 |
| Inhalants | 22,870 | 22,996 | 22,593 | 22,746 | 22,856 | 22,558 | 22,430 | 22,552 | 21,778 | 22,323 | 21,695 | 21,068 |
| Nonmedical Use of Psychotherapeutics | 47,958 | 49,001 | 49,157 | 49,717 | 51,983 | 50,541 | 52,154 | 51,991 | 51,832 | 53,243 | 54,389 | 53,172 |
| Pain Relievers | 29,611 | 31,207 | 31,768 | 32,692 | 33,478 | 33,132 | 34,992 | 35,197 | 34,908 | 34,247 | 37,045 | 35,423 |
| OxyContin | 1,924 | 2,832 | 3,072 | 3,483 | 4,116 | 4,379 | 4,857 | 5,863 | 6,160 | 5,517 | 6,579 | 6,973 |
| Tranquilizers | 19,267 | 20,220 | 19,832 | 21,041 | 21,318 | 20,253 | 21,251 | 21,840 | 22,187 | 21,655 | 23,639 | 23,193 |
| Stimulants | 23,496 | 23,004 | 22,297 | 20,983 | 22,495 | 21,669 | 21,285 | 22,633 | 21,739 | 20,379 | 21,498 | 21,655 |
| Methamphetamine | 15,365 | 15,139 | 14,512 | 12,663 | 14,226 | 13,081 | 12,634 | 12,908 | 13,090 | 11,928 | 12,299 | 12,257 |
| Sedatives | 9,960 | 9,510 | 9,891 | 8,982 | 8,842 | 8,601 | 8,020 | 8,633 | 7,653 | 7,315 | 7,939 | 7,480 |
| ILLICIT DRUGS OTHER THAN MARIJUANA | 70,300 | 71,128 | 70,657 | 71,822 | 72,934 | 73,654 | 75,907 | 76,080 | 76,672 | 75,447 | 78,034 | 78,076 |

*Low precision; no estimate reported.
NOTE: Some 2006 to 2010 estimates may differ from previously published estimates due to updates (see Section B.3 in Appendix B of the Results from the 2013 National Survey on Drug Use and Health: National Findings).
a Difference between estimate and 2013 estimate is statistically significant at the 0.05 level.
b Difference between estimate and 2013 estimate is statistically significant at the 0.01 level.
1 Illicit Drugs include marijuana/hashish, cocaine (including crack), heroin, hallucinogens, inhalants, or prescription-type psychotherapeutics used nonmedically. Illicit Drugs Other Than Marijuana include cocaine (including crack), heroin, hallucinogens, inhalants, or prescription-type psychotherapeutics used nonmedically. The estimates for Nonmedical Use of Psychotherapeutics, Stimulants, and Methamphetamine incorporated in these summary calculations do not include data from new methamphetamine items added in 2005 and 2006. See Section B.4.6 in Appendix B of the Results from the 2006 National Survey on Drug Use and Health: National Findings.
2 Nonmedical use of prescription-type psychotherapeutics includes the nonmedical use of pain relievers, tranquilizers, stimulants, or sedatives and does not include over-the-counter drugs.
3 Estimates of Nonmedical Use of Psychotherapeutics, Stimulants, and Methamphetamine in the designated rows include data from new methamphetamine items added in 2005 and 2006 and are not comparable with estimates presented in NSDUH reports prior to the 2007 National Findings report. For the 2002 through 2005 survey years, a Biennial stochastic imputation procedure was used to generate adjusted estimates comparable with estimates for survey years 2006 and later. See Section B.4.6 in Appendix B of the Results from the 2009 National Survey on Drug Use and Health: National Findings.
Source: SAMHSA, Center for Behavioral Health Statistics and Quality, National Survey on Drug Use and Health, 2002-2013.

CONFIDENTIAL                                                                                                PUBLICIS-2161987

Source: "Table 7.1A – Types of Illicit Drug Use in Lifetime among Persons Aged 12 or Older: Numbers in Thousands, 2002-2013," PUBLICIS-0161987.

144. Publicis understood that the reformulation did not reverse the trend of increasing opioid use disorder from OxyContin. Notwithstanding the FDA's CDER 2015 Guide for Industry findings that "these technologies [referring to opioid abuse deterrent products] have not yet proven successful at deterring the most common form of abuse – swallowing a number of intact capsules or tablets to achieve a feeling of euphoria[,]"[72] Publicis continued to market OxyContin with schemes designed to overcome prescribers' objections about the risk of abuse.[73] In 2017, Publicis

---

[72] *Abuse-Deterrent Opioids – Evaluation and Labeling, Guidance for Industry*, U.S. DEP'T OF HEALTH & HUMAN SERVS. (Apr. 2015), https://www.fda.gov/files/drugs/published/Abuse-Deterrent-Opioids-Evaluation-and-Labeling.pdf.

[73] *See infra* ¶107. In September 2020, an FDA advisory committee overwhelmingly panned the idea that Purdue Pharma's ADF of OxyContin "meaningfully reduced" overall opioid use disorder, overdose, and death. Only two of the 28 members of the FDA's Drug Safety and Risk Management and Anesthetic and Analgesic Drug Products advisory committees voted "yes" on whether the reformulated OxyContin lessened overall abuse since it was introduced in 2010. Twenty-six members of the panel also rejected the idea that the ADF version had a substantial impact on overdose rates. Amanda D'Ambrosio, *FDA Panel: Reformulated OxyContin Did Not Reduce Overall Abuse*, MEDPAGE TODAY (Sept. 11, 2020), https://www.medpagetoday.com/publichealthpolicy/opioids/88583.

staff persisted despite knowing that epidemiologic studies might showed that nothing in the ADF for OxyContin would lead to reduced abuse, misuse and/or diversion in the community.[74]

### 1.      Guilty Again

145.     On October 20, 2020, Purdue, who had followed Publicis' advice and recommendations, agreed with the DOJ to plead guilty to improper marketing of OxyContin and other opioids again.  This time Purdue's plea agreement concerned conduct from 2010 to 2018, exactly the time Publicis began working with Purdue.

146.     Purdue agreed to plead guilty to a dual-object conspiracy to defraud the United States and to violating the Food, Drug, and Cosmetic Act, 21 U.S.C. §§331, 353, violating anti-kickback laws, and using aggressive marketing tactics to convince doctors to unnecessarily dispense frivolous opioid prescriptions, as related to its opioid sales and marketing practices after the 2007 guilty plea.  Essentially, Purdue pleaded guilty to helping fuel, if not create, the prescription drug addiction crisis that has plagued our country for the last three decades.

147.     While the new plea agreement does not identify Purdue's co-conspirators, and Publicis was not identified by name in the plea agreement, Purdue's new guilty plea explicitly concerns conduct that directly implicates Publicis in the conspiracy.  Indeed, it is the same conduct described in this Complaint.

148.     Further, Purdue admitted that E2E – a program that Publicis aided in "was overseen by [McKinsey] and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ("EOT") and Project Management Office ("PMO")."  While McKinsey created the *E2E* strategy, Publicis aided and worked with Purdue to increase its implementation to increase OxyContin sales.

---

[74]     *See infra* ¶136.

## V.      PUBLICIS' WORK WITH OTHER OPIOID MANUFACTURERS

149.      During the pendency of its long-term relationship with Purdue, and their joint efforts to grow the overall opioid market, Publicis also sought to use its opioid experience to expand its own client base.  Publicis partnered with Endo,[75] Teva,[76] Janssen,[77] and others to market those clients' opioid brands.  While it sought to grow the overall pie, Publicis also endeavored to grow each slice.  It sought opioid market expansion from both angles.  And, in doing so, it deployed many of the same tactics, at the same time, for numerous competing opioid brands.

150.      The strategies and campaigns may appear redundant, as the marketing strategies and campaigns Publicis promoted for its various opioid manufacturing clients all followed similar patterns.  But, Publicis was the common denominator.

### A.      ENDO

151.      Publicis (d/b/a Saatchi & Saatchi) was the Agency of Record for Opana, Endo's brand of oxymorphone.  With the legacy assets of Percodan and Percocet,[78] Endo's business had always been focused on opioid sales.  Oxymorphone is not a new opioid, and Opana was not Endo's first oxymorphone product.  Oxymorphone was first synthesized more than a century ago in Germany, and in 1959 Endo began selling it in the United States under the name Numorphan.

---

[75]  "Endo" refers collectively to Endo Health Solutions Inc.; Endo Pharmaceuticals, Inc.; and Endo International plc.

[76]  "Teva" refers to collectively to Teva Pharmaceutical Industries Ltd. and Teva Pharmaceuticals USA, Inc.

[77]  "Janssen" refers to Janssen Pharmaceuticals, Inc.

[78]  *Our Story*, ENDO, https://www.endo.com/about-us/history#fragment-26 (last visited Mar. 8, 2024).

152.    Numorphan was referred to as "blues," after the color of the 10 mg pills.  According to some, it delivered a more euphoric high than heroin.  In 1974, the National Institute on Drug Abuse noted in its "Drugs and Addict Lifestyle" report that Numorphan was popular as an abused drug for its quick and sustained effect.[79]  In 1979, Numorphan was withdrawn from the market.

153.    In 2006, Endo launched its own "new set" of branded oxymorphone products, Opana and Opana ER.[80]  Opana was the same molecule as Endo's older oxymorphone product, Numorphan.

154.    With the launch of Opana, Endo decided it was time for history to repeat itself. After the FDA's approval of Opana in 2006, Endo solidified its position as a pain specialist among manufacturers.  By 2012, opioid sales accounted for approximately $403 million of Endo's $3 billion in revenue, almost 14%.  Between 2010 and 2013, total Opana ER revenue alone exceeded $1.1 billion.

155.    Opana and Numorphan were both oxymorphone.  The brand name was the only thing that changed.  What Endo removed from the market in 1979 due to abuse concerns, it re-introduced 27 years later.  After 2006, Opana was on occasion referred to as "Blue Heaven" or, more to the point, "New Blues."[81]

156.    Within a few years of its introduction in the United States, abuse of the drug became widespread.  Endo then sought to introduce a reformulated version of Opana that it could market as abuse-deterrent by introducing a tamper-resistant coating to the pill.

---

[79]    John Fauber & Kristina Fiore, *Abandoned Painkiller Makes a Comeback*, MEDPAGE TODAY (May 10, 2015), https://www.medpagetoday.com/psychiatry/addictions/51448.

[80]    *Our Story,* supra n.78.

[81]    *Oxymorphone*, DRUG ENFORCEMENT ADMIN. (Nov. 2022), https://www.deadiversion.usdoj.gov/drug_chem_info/oxymorphone.pdf.

157. In December 2011, Endo obtained FDA approval for a new formulation of Opana ER with a coating that Endo claimed was crush-resistant, calling it "INTAC" technology. However, the following month, the FDA told Endo that Opana ER, could not be marketed even after the reformulation, as abuse-deterrent.

158. Endo "did not submit any new clinical safety or efficacy data" as part of its application, but rather relied entirely on the "bioequivalence" of the new and old formulations of Opana.[82] Obtaining approval of reformulated Opana ER on this basis allowed Endo to rely on the safety and efficacy of the original version of the drug as the basis for approval of the reformulated version. However, the FDA determined that such promotional claims could provide a false sense of security since the product could still be chewed and ground for subsequent use. In other words, Opana ER was still crushable. In December 2011, Endo admitted that "[i]t has not been established that this new formulation of Opana ER is less subject to misuse, abuse, diversion, overdose, or addiction."[83]

159. Of course, these characteristics that Endo, and later Publicis, promoted as part of Opana ER, did not exist. While the reformulation was designed to prevent the pill from being crushed and snorted, it did nothing to prevent intravenous use. However, once Endo reformulated

---

[82] Intervenor Impax Laboratories, Inc.'s (1) Cross-Motion to Dismiss; or, in the Alternative, (2) Opposition to Plaintiff's Motion for a Preliminary Injunction, *Endo Pharms. Inc. v. U.S. Food & Drug Admin.*, No. 1:12-cv-01936 (D.D.C. Dec.9, 2012), ECF 18, at 7; *see also Summary Review for Regulatory Action*, FDA CENTER FOR DRUG EVALUATION AND RESEARCH, NDA 201655, at 6 (Dec. 9, 2011) (stating that "[n]o new safety data were included in this submission" and "[n]o efficacy studies were submitted in this application"), https://www.accessdata.fda.gov/drugsatfda_docs/nda/2011/201655Orig1s000SumR.PDF.

[83] *Endo Announces FDA Approval of a new Formulation of Opana® ER Designed To Be Crush-Resistant*, ENDO (Dec. 12, 2011), https://investor.endo.com/news-releases/news-release-details/endo-announces-fda-approval-new-formulation-opanar-er-designed.

Opana to have a crush resistant coating, many users who were already dependent on the drug began to inject drugs for the first time.[84]

160. Endo's 2012 reformulation of Opana caused outbreaks of human immunodeficiency virus ("HIV") in populations of intravenous Opana users. In Austin, Indiana, Opana use led to an outbreak of at least 200 HIV cases in a town with a population of 4,500.[85]

161. Intravenous use of reformulated Opana has also been associated with outbreaks of Hepatitis C and Thrombotic Thrombocytopenic Purpura ("TTP"). [86] The concerns even reached Wall Street, where investors asked Endo about a TTP outbreak in Tennessee associated with Opana ER. Endo's chief scientific officer, Ivan P. Gergel, assured the investors that Endo had "designed the Opana crush-resistant formulation to be crush-resistant, to avoid primarily the nasal root of abuse[.]"[87] Gergel went on to say that the outbreak was, like the outbreak in Indiana, in "a very, very distinct area of the country."[88]

---

[84] *See* Kelly McEvers, *Opioid Epidemic Sparks HIV Outbreak In Tiny Indiana Town*, NPR (Mar. 31, 2016), https://www.npr.org/2016/03/31/472577254/opioid-epidemic-sparks-hiv-outbreak-in-tiny-indiana-town.

[85] *Id.*

[86] *Thrombotic Thrombocytopenic Purpura (TTP)–Like Illness Associated with Intravenous Opana ER Abuse – Tennessee, 2012*, MORBIDITY & MORTALITY WEEKLY REP. (Jan. 11, 2013), https://www.cdc.gov/mmwr/pdf/wk/mm6201.pdf.

[87] Tom Dreisbach, *How A Painkiller Designed To Deter Abuse Helped Spark An HIV Outbreak*, NPR (Apr. 1, 2016), https://www.npr.org/sections/health-shots/2016/04/01/472538272/how-a-painkiller-designed-to-deter-abuse-helped-spark-an-hiv-outbreak.

[88] *Id.*

162.    In addition to its branded products, Endo, through its subsidiaries Qualitest Pharmaceuticals, Inc. and, after its acquisition in 2015, Par Pharmaceuticals,[89] also manufactured generic versions of oxycodone, oxymorphone, hydromorphone, and hydrocodone.

163.    Ultimately, Endo and Publicis were laser-focused on maximizing the overall sales of Endo products, and decidedly **not** on concerns over their actual abuse potential or the appropriate size of the market for these products, given evident, longstanding, and ever-present concerns about their abuse.  Both Publicis and Endo desired for the size of the overall opioids market to grow in line with the introduction of "differentiated" products like a reformulated Opana, as the so-called "differentiation" gave Publicis an opportunity to market something new about the product regardless of whether or not the new characteristic was actually good for patients.

164.    Endo's actual intentions to simply maximize its profits through Opana sales, despite the likely abuse of its drugs, were clear, given Endo's particularly striking decision: to continue to sell the old formulation of Opana despite promoting a message that its new formulation dispensed with the purportedly dangerous characteristics of the old formulation.

165.    In fact, Endo continued to distribute original Opana for nine months after its reformulated version became available, and it declined to recall original Opana ER despite its known dangers.

166.    Later in 2017, Endo would again remove its oxymorphone product from the market at the request of the FDA, given the FDA's acute concerns regarding Opana's abuse potential.

---

[89]  "Par Pharmaceuticals" refers collectively to Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc.

167.    In 2018, Publicis boasted about its new work for Endo as one of the "[m]ain wins" of its new business that year. [90]  However, Publicis' relationship with Endo dated back more than ten years.

### 1.    Publicis Targets Patients and Targets Prescribers

168.    Publicis replicated the targeting work it had done for Purdue for its other clients as well, and Endo was no exception.

169.    In 2007, Publicis (then Saatchi & Saatchi) came up with a new marketing angle that relied on the Joint Commission on Accreditation of Healthcare Organizations' ("JCAHO") recent adoption of pain as "the fifth vital sign." [91]  Hospitals were then required to assess and treat patients' pain as a matter of course.[92]  JCAHO had "mandated that hospitals poll each of their patients at the end of their stay about whether their pain had been adequately treated."[93]

---

[90]    *See Accelerated Transformation and Record Year, Both Commercially and Financially*, PUBLICIS GROUPE (Feb. 6, 2019), https://www.publicisgroupe.com/en/news/press-releases/publicis-groupe-2018-annual-results.

[91]    JCAHO has since abandoned its use of "pain" as one of the five vital signs.

[92]    Horwitz, *supra* n.68.

[93]    Melina Sherman, *Opiates for the masses: constructing a market for prescription (pain)killers*, at 4, J. OF CULTURAL ECON. (July 16, 2017), https://www.tandfonline.com/doi/full/10.1080/17530350.2017.1352010.



170.    The scores that hospitals received were extremely important to hospitals seeking to maintain their accreditation.  "A low score puts a hospital in jeopardy of being ruled ineligible for Medicaid reimbursements."[94]

171.    Publicis approached prescribers with a simple idea: prescribe Opana, and you won't have to worry about low JCAHO scores.  "[I]t suffices to say that this system incentivizes the use of drugs – as reliable, fast-acting methods for (temporarily) warding off the experience of pain.  It is telling, after all, that the uptake of these new systems and instruments of objectively measuring the subjective experience of pain have paralleled steep increases in opioid prescriptions."[95]

172.    In 2013, Publicis advised Endo to direct its key opinion leaders ("KOLs") to instruct prescribers that Opana ER with INTAC was the only oxymorphone designed to be "crush-resistant," and advised them to state during their speeches that the only way for patients to receive

---

[94]    *Id.*

[95]    *Id.*

a crush resistant formulation of oxymorphone ER was to prescribe Opana ER with INTAC. The KOLs were advised to stress that the generic versions of Oxymorphone were not designed to be crush-resistant.

173.     With respect to Opana ER's 12-hour dosing, the Federal Trade Commission observed in a complaint against Endo, "compared with immediate-release oxymorphone formulation, oxymorphone ER provides longer-lasting, 12-hour pain relief that allows the patient to take fewer pills each day." Of course, the problem, was that "in order to reduce dose frequency, each long-acting opioid carries more active pharmaceutical ingredient than its short-acting counterpart. This makes long-acting opioids such as Opana ER subject to abuse; crushing and ingesting the pills immediately releases the larger amount of active ingredient into the bloodstream."[96]

174.     The higher dosage in Opana ER, along with the "crush-resistant" formulation that Publicis was promoting only helped to make the drug more susceptible to intravenous use by those suffering with addiction and opioid use disorder.

### 2.     Endo's Broader Relationship with Publicis Groupe

175.     Saatchi & Saatchi was not the only Publicis entity who developed a strong working relationship with Endo. For example, during 2012, Endo engaged other Publicis Groupe subsidiaries to work to develop methods to switch patients from drugs like Vicodin to long acting opioids like Opana ER and to further expand the use of Endo's opioid drugs.

---

[96]  *See* Complaint for Injunctive and Other Equitable Relief, at ¶57, *FTC v. Endo Pharms., Inc.*, No.          1:21-cv-217-RCL          (D.D.C.          Jan.          25,          2021), https://www.ftc.gov/system/files/documents/cases/003_2021.03.02_revised_redacted_complaint. pdf.

B.    **TEVA**

176.    Until 2023, Teva, another opioid manufacturer named in numerous lawsuits for its role in the opioid crisis, was led by President and CEO and McKinsey alumnus, Kåre Schultz ("Schultz").  Schultz joined the company in 2017, at which point he was also appointed to Teva's board of directors.[97]

177.    By 2011, Teva had acquired Cephalon, Inc. ("Cephalon"), another manufacturer of opioids, as "[a] core part of [Teva's] strategy" of "growth through acquisitions[.]"[98]  After it acquired Cephalon, – Fentora's original manufacturer – Teva began selling Fentora, a powerful fentanyl buccal tablet.[99]  The fentanyl medication was authorized by the FDA in 2006 for its limited use in the treatment of breakthrough pain in cancer patients receiving opioid treatment and who had developed a tolerance to it.[100]  Two years later, the FDA would note the increase of "off-label prescribing"[101]

---

[97]   Gretchen Morgenson, *Consulting giant McKinsey allegedly fed the opioid crisis.  Now an affiliate may profit from treating addicts*, NBC NEWS (Feb. 8, 2021), https://www.nbcnews.com/news/us-news/consulting-giant-mckinsey-allegedly-fed-opioid-crisis-now-affiliate-may-n1256969.

[98]   Teva Pharmaceutical Industries Limited, Form 20-F, at 8 (Dec. 31, 2012), https://www.sec.gov/Archives/edgar/data/818686/000119312514041871/d649790d20f.htm.

[99]   *See Teva Completes Acquisition of Cephalon*, FIERCE PHARMA (Oct. 14, 2011), https://www.fiercepharma.com/pharma/teva-completes-acquisition-of-cephalon.

[100]   *See Fentanyl Buccal Tablets (marketed as Fentora) Information*, U.S. FOOD & DRUG ADMIN. (July 15, 2015), https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/fentanyl-buccal-tablets-marketed-fentora-information.

[101]   Memorandum from Bob A. Rappaport, MD to the Anesthetic and Life Support Drugs Advisory Committee (Apr. 26, 2008), *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804-DAP (N.D. Ohio (Aug. 13, 2019), ECF 2231, at 1.

178.    The FDA, in an April 26, 2008, memorandum discussing the possibility of an "expanded indication for Fentora for use in break-through pain in patients with chronic pain not caused by malignancy," expressed concern about Fentora's active ingredient, fentanyl, and the growing misuse of opioids despite the safeguards already put in place by the FDA:

> Fentanyl has an extremely narrow therapeutic window, and even in opioid tolerant patients misuse and errors in dosing can result in significant morbidity and mortality.  Exposure to minute quantities of fentanyl in opioid non-tolerant people, especially children and the elderly, can be lethal in minutes.  If this product is to be indicated for increased widespread use, and if availability increases, a risk mitigation program that will attempt to prevent, monitor and intervene when necessary, will be essential.  However, as already noted, the current paradigms for risk management for potent opioid drug products may not have been fully successful.[102]

179.    Consistent with Dr. Rappaport's concerns, on December 28, 2011, the FDA mandated a Risk Evaluation and Mitigation Strategy for Fentora and other Transmucosal Immediate Release Fentanyl.[103]

180.    In 2013, with Publicis' acquisition of Heartbeat Ideas,[104] Teva joined the ranks of Publicis' opioid manufacturing clients and also availed itself of Publicis' myriad services.

181.    Because of its client relationships, Publicis was in a unique position to know how each opioid manufacturer's sales and marketing tactics were playing out, both in terms of ROI for

---

[102] *Id.* at 2.

[103] *See Questions and Anwers: FDA approves a class Risk Evaluation and Mitigation Strategy (REMS) for transmucosal immediate-release fentanyl (TIRF) medicines*, U.S. FOOD & DRUG ADMIN. (Dec. 28, 2020), https://www.fda.gov/drugs/information-drug-class/questions-and-answers-fda-approves-class-risk-evaluation-and-mitigation-strategy-rems-transmucosal.

[104] *Publicis Groupe Expands Digital Health Expertise, Heartbeat Ideas and Heartbeat West to Join Saatchi & Saatchi Health Agencies in U.S.*, PUBLICIS GROUPE (Oct. 30, 2013), https://www.publicisgroupe.com/sites/default/files/press-release/prz2tt2.pdf.

their individual clients and market performance of their branded opioid products.  Publicis knew it all and knew it in real time.

C.   **JOHNSON & JOHNSON/JANSSEN**

182.    Arista Marketing Associates, Inc. ("Arista") was a Publicis company eventually folded in to Publicis Touchpoint Solutions.  Arista specialized in "multichannel physician access above and beyond face-to-face detailing."[105]  "We create live conversations with physicians and other healthcare professionals, ranging from 2-minute teledetails to 12-minute web-based video details[,]" Arista explained.[106]

183.    Nucynta was Janssen's branded tapentadol product.  Nucynta was first approved as a Schedule II controlled opioid agonist tablet and oral solution in 2008 and indicated for "relief of moderate to severe acute pain in patients 18 years of age or older."[107]

184.    In fact, Scott Dreyer ("Dreyer"), who served as Vice President of Hospital and Oncology Sales and later Vice President of Primary Care Sales for Publicis Touchpoint Solutions, a subsidiary of Publicis Groupe, would later become Janssen's executive Vice President and Chief Commercial Officer in 2018.

185.    Coincidentally, in 2013, while Dreyer was with Publicis Touchpoint Solutions, Janssen and Publicis (d/b/a Razorfish Health) would be recognized as 2012's "Best in Benchmark" consumer and healthcare professional digital marketing performance in the category of Healthcare

---

[105] *Arista Marketing Associates Rolls Out Multichannel Physician Access Program for Leading Pharma Co.*, PRLOG (June 11, 2009), https://www.prlog.org/10256062-arista-marketing-associates-rolls-out-multichannel-physician-access-program-for-leading-pharma-co.html.

[106] *Id.*

[107] *Nucynta*, RxLIST (Jan. 9, 2024), https://www.rxlist.com/nucynta-drug.htm.

Provider Website Visit Volume for their work on the Nucynta campaign.[108]   It was clear that Publicis was in the game and doing its best to push for increase opioid sales for all of its opioid manufacturing clients.

186.    In 2013, recognizing the revenue potential that pharmaceutical companies provided to marketing and advertising agencies, Med Ad News reported that in 2012, Johnson & Johnson spent $58,336,625 in direct–to-consumer advertising while Teva spent $49,768,660.[109]   Both companies demonstrated growth in their advertising budgets but while Johnson & Johnson's expenditure grew by 4%, Teva's grew by 64% from 2011.[110]   These advertising budgets were indicators that manufacturers like Johnson & Johnson and Teva, were committed to growing their markets and directly reaching consumers.  With such attractive numbers, Publicis was going to help get them to where they wanted to go.

    D.    **Servicing All Manufacturers as a Group**

187.    Publicis did more than perform discreet work for individual opioid manufacturers; it crafted industry-wide marketing efforts to boost sales not only of individual opioid products, but of opioids generally.  A rising tide lifts all boats.  Or, to borrow the Purdue's executive's analogy, Publicis worked to "make the pie bigger for all."[111]

---

[108] *Awards set the mark for pharma sites*, MED AD NEWS (May 2013), https://pharmalive.com/wp-content/uploads/2015/02/131682-MedAdNews-May.pdf.

[109] *Id.*

[110] *Id.*

[111] Horwitz, *supra* n.68.

188.     Accordingly, in addition to maintaining separate client relationships with multiple opioid manufacturers, Publicis also worked for industry-wide groups to coordinate marketing and advertising related to opioids, generally.

### E.     Making Money off the Treatment - Publicis and Orexo AB

189.     The cognitive dissonance within Publicis as it embarked upon its work with Purdue on E2E must have been palpable.  Three months after Publicis was working on OxyContin coupons, Swedish pharmaceutical company Orexo AB ("Orexo") announced that Zubsolv, its drug designed to treat opioid addiction, had been approved by the FDA.  Zubsolv is a combination of buprenorphine and naloxone.  When Zubsolv launched in 2013, Orexo projected peak sales of the drug to exceed $500 million, annually.

190.     However, Orexo did not have a significant presence in North America when Zubsolv was approved.  It did not have its own sales force in North America to market its drug. As the most attractive market in which to sell opioid dependency treatments, Orexo desired to partner with someone in the United States who had the expertise and capacity to successfully launch Zubsolv.

191.     On July 1, 2013, Orexo announced "that the company has entered into a commercial partnership with Publicis Touchpoint Solutions for the launch of Zubsolv in the United States. . . . Publicis Touchpoint Solutions will be responsible for the execution of all field-based promotion activities through dedicated sales representatives and medical support to health care practitioners through deployment of a dedicated medical scientific liaison team."[112]

---

[112] *Orexo Forms a Commercial Partnership with Publicis Touchpoint Solutions for launch of Zubsolv™ in the US*, BUS. WIRE (July 1, 2013), https://www.businesswire.com/news/home/20130701005515/en/Orexo-Forms-a-Commercial-Partnership-with-Publicis-Touchpoint-Solutions-for-launch-of-Zubsolv-in-the-US.

192. In announcing the partnership, Orexo CEO Nikolaj Sorensen emphasized Publicis' "knowledge of the opioid dependence therapeutic area," in addition to its expertise with "similar product launches," as primary reasons Orexo chose Publicis to be its partner.

193. As described in detail above, Publicis did indeed have expertise with similar product launches. While its sales representatives in Publicis Touchpoint Solutions were diligently selling Zubsolv for Orexo, Publicis worked just as diligently through its other agencies with other opioid manufacturers to maximize the sales of the drugs that were the direct source of Zubsolv's indication. The same year it partnered with Orexo to launch Zubsolv, Publicis billed Purdue Pharma around $8 million for marketing work on OxyContin and other Purdue opioid products.

194. Most incredibly, Publicis began work on Purdue and McKinsey's E2E project less than three months after its partnership with Orexo was announced.

195. Through its work with Orexo, Publicis gained knowledge of the market opportunities created by widespread opioid dependency, and of the co-dependence of the markets for opioid treatments and opioid use disorder treatments.

196. As Orexo, Publicis' partner, described in its 2013 annual report, "[p]rescription painkillers containing opioids are highly addictive, and regular or long-term use can lead to physical dependence." Orexo further observed that "[m]any abusers begin by taking opioids orally," [113] and that the misuse of opioid prescription drugs was a "[g]rowing problem[,]" with "opioid . . . dependence more common than the abuse of, or dependence on, any other type of prescription medication."[114]

---

[113] Orexo, *Annual Report 2013*, at 10, https://mb.cision.com/Main/694/9557375/224609.pdf (last visited Mar. 8, 2024).

[114] *Id.*

197.    Describing the addressable market for Zubsolv, Orexo stated that the "cost of prescription opioid abuse, dependence and misuses in the US is estimated to exceed USD 56 billion per year," and further, that "15,000 people die from opioid pain relievers each year in the US. Deaths from opioid pain relievers exceed those from all drugs and traffic accidents."[115]

198.    The solution to the opioid crisis seemed all too clear:

Zubsolv has entered a large and growing market.  The current US market of products containing buprenorphine/naloxone amounts to approximately USD 1.9 billion, before rebates to payers, co-ay support and other discounts.  The market continued to grow by 9 percent in value and 10 percent in volume during 2013. Continued double-digit growth is likely in the years to come, and will be driven by the significant unmet medical need, the growing number of opioid dependent patients as well as the impact of the Affordable Care Act.[116]

199.    Publicis Touchpoint Solutions provided a contract sales force to Orexo through the second quarter of 2014, and continued to advise Orexo on Zubsolv sales through at least 2019.[117]

200.    By 2015, Orexo stated flatly, "[t]here is no doubt opioid addiction has become one of the major health concerns in the US and a disease [that is] currently out of control."[118]  The market for Zubsolv was booming, as it experienced an 83% increase in revenue over the prior year.[119]

201.    Throughout its time selling a treatment for opioid use disorder, Publicis worked on all fronts, with multiple clients, to maximize the sales of opioids, the same drugs that caused the

---

[115] *Id.*

[116] *Id.*

[117] *See* Susan Broadnix, LINKEDIN, https://www.linkedin.com/in/susan-broadnix-8794bb7/ (last visited Mar. 8, 2024).

[118] *See* Orexo, *Annual Report 2015*, at 4, https://mb.cision.com/Main/694/9942119/491960.pdf (last visited Mar. 8, 2024).

[119] *Id.*

condition that Zubsolv – another drug it was being paid to sell – treats.  The synergies could not have been more perfect.  Publicis helped Orexo service a demand that it had a principal role in creating, sustaining, and growing through its contemporaneous work with Purdue, Endo, Teva, and Janssen, on E2E, and other projects.  Indeed, without Publicis' efforts promoting opioids for its other clients, there may not have been such an attractive market for Zubsolv.

202.    Publicis had its hand in hooking pain patients on opioid prescription drugs and seeing its profits climb as more and more people got hooked on opioid prescriptions.  Now it was going to profit on the cure, as Publicis sold the pill to the same pain patients promising them a comeback from their addictions.

## VI.    TOLLING OF STATUTES OF LIMITATIONS

203.    Publicis is equitably estopped from relying upon a statute of limitations defense.  Alongside Purdue, and other opioid manufacturers, Publicis undertook active efforts to deceive Plaintiff and to purposefully conceal their unlawful conduct while it fraudulently assured the public, including Plaintiff, that opioids were non-addictive, effective, and safe for the treatment and care of long-term chronic pain and non-acute, non-cancer pain.  For example, and without limitation, Publicis concealed its efforts to help Purdue: (i) circumvent the restrictions of the Corporate Integrity Agreement in order to increase the sale of opioids; and (ii) further boost the sale of opioids after the expiration of the Corporate Integrity Agreement, including through "Project Turbocharge" and "Evolve to Excellence."  Publicis never strayed from its goal of continuing to increase sales, and greater access to prescription opioids to generate maximum profits.

204.    Publicis and Purdue were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing of opioids.  Without any reliable scientific evidence, Publicis' deceptive marketing delivered false messages that opioids were safer, less

subject to abuse, and less addictive than other pain medications. Publicis' marketing omitted or concealed material facts, and failed to correct prior misrepresentations and omissions about the purported benefits and risks of opioids. Publicis' false messages led to the oversupply of opioids via overprescribing and suspicious sales and further fueled the opioid epidemic.

205. **Discovery Rule**. Publicis' services were given confidentiality, and both Publicis and Purdue concealed the content and extent of Publicis' services from the public. In effect, Publicis actively concealed its role in shaping, editing, provided false and misleading materials and content regarding pain management and opioids that were widely distributed and circulated to regulators, prescribers, and the public at large, including Plaintiff. Plaintiff did not have knowledge of the scope, magnitude, and unlawful nature of Publicis' conduct until 2020, when documents produced in the Purdue bankruptcy proceeding revealed details regarding Publicis' in advising Purdue and working with Purdue to implement the unlawful conduct and deceitful marketing detailed in this Complaint. Information in the public domain was insufficient to place Plaintiff and the Class on inquiry notice of Publicis' unlawful, unfair, and deceptive activities prior to 2020. For these reasons, any statutes of limitations applicable to the claims of Plaintiff and the Class did not begin to run and have been tolled until at least some point in 2020.

206. **Fraudulent Concealment**. The statutes of limitation were further tolled by the doctrine of fraudulent concealment. Publicis and Purdue also actively concealed from Plaintiff the existence of the Plaintiff's claims by hiding Purdue's lack of cooperation with law enforcement. For example, in May 2007, Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors about the risk of addiction and entered into a Corporate Integrity Agreement explained above. Purdue was ordered to pay $600 million in fines and fees. In its plea, Purdue admitted that its

promotion of OxyContin was misleading and inaccurate, misrepresented the risk of addiction, and was unsupported by science.  Additionally, Michael Friedman, the company's president, pled guilty to a misbranding charge and agreed to pay $19 million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and Paul D. Goldenheim, Purdue's former medical director, pled guilty as well and agreed to pay $7.5 million in fines.  But even after the guilty pleas and the requirements of the Corporate Integrity Agreement, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund seemingly neutral organizations to disseminate the message, as designed by Publicis, that opioids were non-addictive, as well as other misrepresentations.  Publicis knew these representations were false, and without knowledge of the truth and/or having no reasonable ground for believing such assertions, recklessly devised and implemented a strategy to spread these deceptive and misleading claims to health care providers, consumers, Plaintiff, the Class, and the public in order to boost sales of opioids, including OxyContin, despite the public impression that Purdue had corrected its conduct as a result of the Corporate Integrity Agreement.

207.    Publicis and Purdue furthered the deception by seeking to convince the public that Purdue's primary concern was the health and safety of its patients, which it claimed via marketing campaigns aimed at convincing the public that Purdue was working to curb the opioid epidemic. Publicis helped Purdue to publicly portray itself as committed to working diligently to prevent diversion of these dangerous drugs and curb the opioid epidemic.  With Publicis' help and direction, Purdue made false claims that it had changed its ways and insisted it was a good corporate citizen.  Meanwhile, Publicis was also designing marketing campaigns and messaging that continued business as usual and indiscriminately targeted high prescribers to promote opioids as safe but avoiding the pitfalls of the Corporate Integrity Agreement.  These repeated

misrepresentations misled regulators, prescribers, and the public, including Plaintiff, and deprived Plaintiff of actual or implied knowledge of facts sufficient to put Plaintiff on notice of potential claims.

208.    Purdue also assembled an army of lobbyists to fight any legislative actions that might encroach on its business.  Between 2006 and 2015, Purdue and other painkiller producers, along with their associated nonprofits, spent nearly $900 million dollars on lobbying and political contributions – eight times what the gun lobby spent during that period.  Publicis participated extensively in these actions and provided Purdue with strategies and assistance to maximize sales as described in this Complaint.  Publicis knew that the actions it was taking with Purdue were unlawful, yet it deliberately proceeded in order to increase Purdue's sales and profits, and in turn to serve its own financial interests.

209.    Publicis' fraudulent concealment prevented Plaintiff and the Class from discovering the nature, scope, and magnitude of Publicis' misconduct, and its full impact on Plaintiff, until 2020, when documents produced in the Purdue bankruptcy proceedings revealed details regarding Publicis' role in advising Purdue to implement the unlawful and deceitful conduct described in this Complaint.  Without the document production in the bankruptcy proceeding, Plaintiff could not have acquired such knowledge earlier through the exercise of reasonable diligence.

210.    Plaintiff reasonably relied on Purdue's affirmative statements, as developed by Publicis, and regarding Purdue's purported compliance with its obligations under the law and consent orders, all of which were false and only intended to save its public image.  Plaintiff did not know and did not have the means to know the truth, due to Publicis' and Purdue's actions and omissions.

211.    Publicis' fraudulent concealment has tolled the running of any statute of limitations. Through its and Purdue's affirmative misrepresentations and omissions, Publicis actively concealed from Plaintiff the risks associated with opioids that led to the opioid crisis.  Publicis' wrongdoing, misrepresentations, and omissions have not ceased as the public nuisance remains unabated.

## VII.    HARM CAUSED TO PRIVATE PAYORS, INCLUDING PLAINTIFF AND CLASS MEMBERS

212.    By increasing opioid prescriptions and use, Publicis fueled the opioid epidemic alongside its clients.  The deceptive marketing strategies developed and implemented by Publicis worked, as described above, and substantially contributed to an explosion in the use of opioids across the country.  Approximately 20% of the population between the ages of 30 and 44, and nearly 30% of the population over 45, have used opioids.  Opioids are now the most common treatment for chronic pain, and 20% of office visits now include the prescription of an opioid.

213.    Publicis' development and implementation of its strategy expanded Purdue's and other manufacturers' role in selling and supplying opioids, even seeking to increase the sales from prescribers who would have raised red flags of potential diversion, and profiting from Purdue's and other manufacturers' role in funneling opioids into communities, beyond what any legitimate market, even an expanded market for chronic pain, could bear.

214.    Compounding the harm from deceptive marketing, Publicis worked with Purdue and other manufacturers to continue and grow the opioid sales from prescribers that raised red flags of diversion, despite manufacturers' legal obligations to report and halt supply.  In doing so, it enabled an oversupply of opioids, which has allowed non-patients to become exposed to opioids, and facilitates access to opioids for both patients who could no longer access or afford prescription opioids and addicts struggling with relapse.

215.     Scientific evidence demonstrates a close link between opioid prescriptions and opioid abuse.  For example, a 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[120]  Most of the illicit use originated from prescribed opioids.

216.     This epidemic of opioid addiction, abuse, and use has caused direct harm to Plaintiff and Class members.  Private payors paid for more opioids than they would have but for the oversupply and increased demand caused by Defendant's and co-conspirators' conduct.  And, Plaintiff and Class members have paid more for related medical care, including treatment for opioid use disorder, drug addiction treatment, and emergency medical care, including the costs of opioid overdose reversal drugs, such as Naloxone Hydrochloride (Narcan).

## VIII.  CLASS ACTION ALLEGATIONS

217.     Plaintiff brings this case on behalf of itself and all others similarly situated under Fed. R. Civ. P. 23(b)(2)-(3) and 23(c)(4) and seeks to represent members of the following nationwide Class:

> All health insurance companies, third-party administrators, health maintenance organizations, self-funded health and welfare benefit plans, third-party payors and any other health benefit providers, in the United States of America and its territories, who have, since April 1, 2010 through a date to be established by the Court (such as the date of approval of class notice), (a) paid or incurred costs for prescription opioids manufactured, marketed, sold, or distributed by the Opioid Marketing Enterprise Members, for purposes other than resale, and/or (b) paid or incurred costs for treatment related to the misuse, addiction, and/or overdose of opioid drugs.

218.     Plaintiff proposes the following Ohio Subclass:

> All health insurance companies, third-party administrators, health maintenance organizations, self-funded health and welfare benefit plans, third-party payors and

---

[120]  Theodore J Cicero, et al., *Relationship between therapeutic use and abuse* of *opioid analgesics in rural, suburban, and urban locations in the United States*, 16.8 PHARMACOEPIDEMIOLOGY & DRUG SAFETY 827-40 (2007), https://pubmed.ncbi.nlm.nih.gov/17636553/.

any other health benefit providers, in the state of Ohio, who have, since April 1, 2010 through a date to be established by the Court (such as the date of approval of class notice), (a) paid or incurred costs for prescription opioids manufactured, marketed, sold, or distributed by the Opioid Marketing Enterprise Members, for purposes other than resale, and/or (b) paid or incurred costs for treatment related to the misuse, addiction, and/or overdose of opioid drugs.[121]

219.    These class exclude: (a) Defendant and its subsidiaries, affiliates, and controlled persons; (b) Defendant's officers, directors, agents, servants, or employees, and the immediate family members of any such person; (c) all persons who and entities that make a timely election to be excluded from the proposed Classes; (d) all federal and state government entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (e) pharmacy benefit managers; (f) any Opioid manufacturers, distributors, and retailers named in actions pending in MDL No. 2804 (N.D. Ohio); and (g) any judges or justices involved in this action, his or her staff, and any members of their immediate families.

220.    Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or further division into subclasses or limitation to particular issues.

221.    **Numerosity**.  The Class is so numerous that joinder of all members is unfeasible and not practicable.  Class members across the country were injured in their business and property by Defendant's conduct of the RICO enterprise and its other unlawful conduct, which took place throughout the United States and impacted the Class and the public nationwide.

222.    **Commonality and Predominance**.  There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, but are not limited to:

---

[121] For ease of reference, the Class and the Ohio Subclass are referred to herein as the "Class" or "Class members."

(a)     whether Defendant misrepresented the safety and efficacy of opioids, to the financial detriment of the Class;

(b)     whether Defendant engaged in a conspiracy or conspiracies to promote the sales of opioids using false and deceptive means;

(c)     whether Defendant engaged in a conspiracy or conspiracies to suppress adverse information about opioids;

(d)     whether Defendant substantially caused or contributed to the opioid epidemic;

(e)     whether Defendant's conduct in creating, proposing, and implementing sales and marketing strategies for opioids manufactured by Purdue before and after Purdue's first guilty plea in 2007 relating to misbranding of OxyContin contributed to the Class' injuries;

(f)     whether Defendant performed reasonable due diligence in ascertaining the risks associated with its strategies for increasing OxyContin sales at Purdue in 2012 and thereafter;

(g)     whether Defendant's implementation of sales and marketing strategies at its clients caused or contributed to an increase in opioid addiction;

(h)     whether, developing plans for its clients to market and sell opioids, Defendant failed to disclose the dangers and risks to the health of persons ingesting the drug;

(i)     whether Defendant conspired with its clients to misrepresent in their advertisements, promotional materials and other materials, among other things, the safety, potential side effects, and convenience of opioids;

(j)     whether Defendant engaged in conduct that violates federal RICO statutes in promoting the sales of and suppressing adverse information about opioids;

(k)     whether Defendant engaged in a scheme to promote the sales of and suppress adverse information about Opioids in violation of federal RICO statutes;

(l)     whether Defendant engaged in a pattern of deceptive, fraudulent, and/or improper activity;

(m)     whether Defendant and the other Opioid Marketing Enterprise Members (defined herein) formed the Opioid Marketing Enterprise for the purpose of effectuating their fraudulent scheme;

(n)     whether the Opioid Marketing Enterprise Members used the U.S. mails and interstate wire facilities to carry out their fraudulent scheme;

(o)     whether the Opioid Marketing Enterprise Members engaged in a pattern of racketeering;

(p)     whether Defendant's conduct, in whole or in part, has substantially affected interstate and intrastate commerce;

(q)     whether Defendant unjustly enriched itself to the detriment of Plaintiff and the members of the Class;

(r)     whether Defendant contributed to the creation of a public nuisance;

(s)     whether the conduct of Defendant, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the members of the Class, and if so, the appropriate class-wide measure of damages;

(t)     whether Plaintiff and the Class paid for more opioids due to Defendant's conduct than they otherwise would have, and/or paid for more medical care, including opioid use disorder and drug addiction treatment, and emergency medical care including the costs of opioid overdose reversal drugs, such as Naloxone Hydrochloride (Narcan);

(u)  whether the Class has been damaged, and if so, the extent of such damages and/or the nature of the equitable relief, statutory damages, or punitive damages to which the Class is entitled; and

(v)  the amount of attorneys' fees, prejudgment interest, and costs of the suit to which the Class is entitled.

223.  **Issue Class**.  The above and other common questions of law or fact also raise particular issues that are suitable for certification under Rule 23(c)(4).

224.  **Typicality**.  Plaintiff's claims are typical of the claims of the members of the Class under Rule 23(a)(3), because Plaintiff and the Class sustained damages arising out of Defendant's wrongful conduct as detailed herein.  Specifically, Plaintiff, having expended substantial sums for the purchase of opioid drugs and treatment for their abuse, asserts claims that are typical of the claims of the entire Class, and will fairly and adequately represent and protect the interest of the Class.

225.  **Adequacy of Representation**.  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions.  Plaintiff and its counsel are committed to vigorously prosecuting this action on behalf of Class members and have the financial resources to do so.  Neither Plaintiff nor its counsel has any interest adverse to those of other Class members.

226.  **Superiority of Class Action**.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3).  Joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual members of the Class may, in some instances, be relatively small, the expense and burden of

individual litigation make it impossible for such Class members individually to redress the wrongs done to them. Also, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and possibly conflicting adjudications of the claims asserted herein. There will be no undue difficulty in the management of this action as a class action, compared with the expense, delay, strain on the Court and parties' resources, and barriers to access that would attend consignment to individual litigation. For many, the result would be no litigation or recourse at all.

227. **Policies Generally Applicable to the Class, Rule 23(b)(2)**. Defendant has acted or failed to act on grounds generally applicable to Plaintiff and the Class, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## IX. CLAIMS FOR RELIEF

228. Plaintiff re-alleges all of the foregoing allegations and incorporates them by reference as if fully set forth in each of its following Claims for Relief, and Plaintiff further alleges as follows:

## COUNT I

### Violation of Racketeer Influences and Corrupt Organizations (RICO), 18 U.S.C. §1961, *et seq*.

229. This claim is brought by Plaintiff on behalf of itself and the Class against Publicis for actual damages, treble damages, and equitable relief under 18 U.S.C. §1964, for violations of 18 U.S.C. §1961, *et seq*., and specifically, 18 U.S.C. §1962(c) and (d).

230. Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §1962(c).

231.    At all relevant times, Publicis is and has been a "person" under 18 U.S.C. §1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

232.    Plaintiff is also "person," as that term is defined in 18 U.S.C. §1961(3), and has standing to sue under 18 U.S.C. §1964(c) as it was and is injured in its business and/or property as a direct result of Defendant's wrongful conduct, "by reason of" the RICO violations as described herein.

233.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions.  18 U.S.C. §1962(d).

234.    Publicis conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§1962(c) and (d).

**Description of the Enterprise**

235.    Section 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4).

236.    Under 18 U.S.C. §1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose; (ii) relationships among those associated with the enterprise; and (iii) longevity sufficient to pursue the enterprise's purpose.

237.    Opioid manufacturers, like Purdue, Johnson & Johnson/Janssen, Teva/Cephalon, and Endo, the Sacklers, unnamed KOLs, and other unnamed parties that participated in the marketing and sale of opioids as described in this Complaint, including PBMs, together with Publicis, (collectively, "Opioid Marketing Enterprise Members" or "Enterprise Members") engaged in a scheme to unlawfully increase sales of opioids – and grow their share of the prescription painkiller market and the market as a whole – through repeated and systematic misrepresentations, concealments, and omissions of material fact about the safety and efficacy of

opioids for treating long-term chronic pain, together with other deceptive and fraudulent acts and practices, as described in the Factual Allegations section of this Complaint.

238.    In order to unlawfully increase the demand for opioids and, thereby, increase their own profits despite their knowledge of the harmful effects that would follow, the Opioid Marketing Enterprise Members formed an association-in-fact.  The opioids manufacturers worked together to accomplish their aims, with Publicis serving as a go-between that held all of the companies together and helped coordinate the deceptive marketing and sales strategies.  Through Publicis and their own personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose: lying to prescribers and Plaintiff in order to increase sales of addictive and dangerous drugs and line the Opioid Marketing Enterprise Members' pockets.  The Opioid Marketing Enterprise Members' substantial financial contributions to the Opioid Marketing Enterprise and the advancement of opioids-friendly messaging fueled the U.S. opioid epidemic.

239.    In the alternative, the association-in-fact Opioid Marketing Enterprise existed just between Publicis, the Sacklers, and Purdue, who worked together to unlawfully increase sales of opioids – and grow Purdue's share of the prescription painkiller market – through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.  Publicis knew Purdue was marketing its opioids illegally and fueling an opioid epidemic, but despite its knowledge that opioids were harmful and addictive, Publicis worked with Purdue to turbocharge the opioids market in order to profit from the crisis.

240.    The Controlled Substances Act and its implementing regulations require that "[e]very person who manufactures, distributes, dispenses, imports, or exports any controlled substance," including opioids, become a "registrant."  21 C.F.R. §1301.11(a); *see also* 21 U.S.C.

§823(a)-(b). These registrants, including opioid manufacturer and distributors, must maintain a system to identify and report suspicious orders, including orders of unusual size or frequency, or orders deviating from a normal pattern, and maintain effective controls against diversion of controlled substances. *See* 21 U.S.C. §823; 21 C.F.R. §1301.74(b).

241.  Despite these duties, Publicis spearheaded a scheme which overarching purpose was to materially expand prescription opioid use by altering the medical community's opioid prescribing practices through repeated fraudulent statements and misrepresentations. The Opioid Marketing Enterprise's scheme was sophisticated, well-developed, and fraudulent and was designed to increase the prescription rate for opioid medications the Opioid Marketing Enterprise Members knew where dangerous and highly addictive. At all relevant times, Publicis was aware of the conduct of the Opioid Marketing Enterprise, was a knowing and willing participant in that conduct, and reaped profits from that conduct in the form of payments from other Opioid Marketing Enterprise Members as a reward for work done to increase sales and distribution of prescription opioids.

242.  Publicis and the Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and Plaintiff and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. These misleading statements included: (a) that addiction is rare among patients taking opioids for pain; (b) that addiction risk can be effectively managed; (c) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition, which the Opioid Marketing Enterprise Members named "pseudoaddiction"; (d) that withdrawal is easily managed; (e) that increased dosing presents no significant risks; (f) that long-term use of opioids improves function; (g) that

the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (h) that use of time-released dosing prevents addiction; and (i) that ADFs provide a solution to opioid abuse.

243. The scheme devised, implemented, and conducted by Publicis and other Opioid Marketing Enterprise Members was a common course of conduct designed to ensure that the Opioid Marketing Enterprise Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the opioid manufacturers' drugs. The Opioid Marketing Enterprise Members acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme.

244. There was regular communication between Publicis and the Opioid Marketing Enterprise Members, in which information was shared, misrepresentations were coordinated, and payments were exchanged. The Opioid Marketing Enterprise Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

245. As public scrutiny and media coverage focused on how opioids ravaged communities throughout the United States, Publicis did not challenge Purdue or other manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence. Instead, despite its knowledge of the ongoing fraud and the danger it posed, Publicis forged on in its participation in the Opioid Marketing Enterprise for financial gain.

246. The impact of the Opioid Marketing Enterprise's scheme is still in place – as opioids continue to be prescribed and used for chronic pain throughout the United States, and the epidemic continues to injure Plaintiff and Class members and consume their resources.

247. The evidence shows that the Opioid Marketing Enterprise Members, including Publicis, were each willing participants in the Opioid Marketing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

**Publicis' Conduct in the Opioid Marketing Enterprise Violated RICO**

248. From at least 2010 to the present, Publicis played some part in directing the affairs of the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

(a) creating and providing a body of deceptive, misleading, and unsupported medical and popular literature about opioids that: (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was, thus, more likely to be relied upon by physicians, patients, and payors and their agents;

(b) creating and providing a body of deceptive, misleading, and unsupported electronic and print advertisements about opioids that: (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was, thus, more likely to be relied upon by physicians, patients, and payors and their agents;

(c) creating and providing a body of deceptive, misleading, and unsupported sales and promotional training materials about opioids that: (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was, thus, more likely to be relied upon by physicians, patients, and payors and their agents;

(d)  devising and implementing marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions and dosages, and evading regulatory constraints; and

(e)  disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications.

249.  The scheme devised and implemented by the Opioid Marketing Enterprise Members amounted to a common course of conduct intended to enrich themselves by increasing sales of prescription opioids by convincing doctors to prescribe and patients to use opioids, including for long-term chronic pain, despite Publicis' and the Opioid Marketing Enterprise Members' knowledge of the addictions and deaths that would occur as a result.  The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

**The Opioid Marketing Enterprise Members Conducted or Participated, Directly or Indirectly, in the Conduct of the Enterprise's Affairs**

250.  Publicis participated in the operation or management of the Opioid Marketing Enterprise itself.

251.  As described herein, Publicis worked with Opioid Marketing Enterprise Members and participated in the conduct of the Enterprise through a pattern of racketeering activity.  Publicis was the mastermind of marketing schemes deployed by the Opioid Marketing Enterprise members to defraud prescribers, the public, and payors, including Plaintiff and the Class, by using the mail and wires in furtherance of plans that were designed with specific intent to defraud.

252.  Publicis, along with the Opioid Marketing Enterprise Members conducted an association-in-fact enterprise and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry out the common purpose of the Opioid Marketing Enterprise, *i.e.*, to unlawfully increase profits and revenues from

the continued prescription and use of opioids for long-term, chronic pain. Through the racketeering activities of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members sought to further the common purpose of the Enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use. In so doing, Publicis and each of the Opioid Marketing Enterprise Members knowingly conducted and participated in the conduct of the Enterprise by engaging in mail and wire fraud, in violation of 18 U.S.C. §§1962(c) and (d).

253. Publicis and each of the Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the Enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription opioids by changing prescriber habits and public perceptions.

254. Specifically, Publicis worked together with the Opioid Marketing Enterprise Members to coordinate the Enterprise's goals and conceal their role, and the Enterprise's existence, from prescribers, the public, and payors, including Plaintiff and the Class by, among other things: (i) funding, editing, and distributing publications that supported and advanced their false messages; (ii) funding KOLs to further promote their false messages; and (iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

255. Further, each of the Opioid Marketing Enterprise Members had systematic links to, and personal relationships with, each other through joint participation in lobbying groups, trade industry organizations, contractual relationships, and continuing coordination of activities. The systematic links and personal relationships that were formed and developed allowed the Opioid

Marketing Enterprise Members the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise. Specifically, each of the Opioid Marketing Enterprise Members coordinated their efforts through the same KOLs and front groups, based on their agreement and understanding that the front groups and KOLs were industry friendly and would work together with the Opioid Marketing Enterprise Members to advance the common purpose of the Opioid Marketing Enterprise; and each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

256. At all relevant times, Publicis formed a part of the Opioid Marketing Enterprise which: (a) had an existence separate and distinct from each opioid manufacturer and its members; (b) was separate and distinct from the pattern of racketeering in which the Opioid Marketing Enterprise Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Opioid Marketing Enterprise Members; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise; and (e) had sufficient longevity for the Enterprise to pursue its purpose and functioned as a continuing unit.

257. Publicis along with the Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. §1341 (mail fraud) and 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids and expand the market for opioids.

258.    Publicis committed, conspired to commit, and/or aided and abetted the Opioid Marketing Enterprise Members in their commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§1341 and 1343) within the past ten years.  The multiple acts of racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity."  The racketeering activity was made possible by Publicis' and the Opioid Marketing Enterprise Members' regular use of the facilities, services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. mail, and interstate wire facilities.  Publicis participated in the scheme to defraud by using mail, telephones, and the internet to transmit communications and payments in interstate or foreign commerce.

**The Conduct Was More than a Typical Business Relationship**

259.    There were strong relationships among those associated with the Opioid Marketing Enterprise and sufficient longevity among Enterprise associates that helped to pursue the Enterprise's common purpose.  The common purpose was to increase opioid revenues unlawfully by misrepresenting and lying about opioids to change prescriber habits and the perception regarding the safety and efficacy of opioids for chronic pain and long-term use.  The Opioid Marketing Enterprise's deceit was, in part, its failure to disclose that increasing strength and dosing actually increased the risk of addiction and overdose and that patients on opioids for more than a brief period develop tolerance, requiring increasingly high doses to achieve pain relief.

260.    As detailed above, in April of 2010, Rosetta entered into a Marketing Services Agreement with Purdue.  Publicis then adopted and assumed the Marketing Services Agreement with Purdue when it acquired Rosetta in May of 2011.

261.    From 2010 through 2019, Publicis (via Rosetta) advised Purdue on research and development, business development, and product licensing related to Purdue's opioid products. Purdue relied heavily on Publicis to help Purdue publicly portray itself as a good corporate citizen who could now be trusted and was even working on an ADF of OxyContin.

262.    Over their many years of working together, Publicis, Purdue, and the Sacklers developed a close relationship as Publicis became entwined in Purdue's business and its efforts in the expansion of OxyContin sales.

263.    The Opioid Marketing Enterprise was more than a typical business relationship. Rather, Publicis knew that opioids were addictive and causing serious harm to people and communities but chose to work together to lie to prescribers, the public, and payors, including Plaintiff and the Class, about these drugs in order to increase their bottom lines. Publicis worked closely with Purdue and other opioid manufacturers to achieve these aims. Publicis, as an advisor of multiple opioid manufacturers, had access to information about multiple players and was able to coordinate the fraud occurring across the Opioid Marketing Enterprise. Publicis was particularly embedded in Purdue's organizational structure and the relationship's longevity was sufficient to pursue the Enterprise's purposes. During the 2010-2019 period in particular, Purdue relied extensively on Publicis to develop its sales and marketing strategy for OxyContin.

264.    The intent to defraud is evident in Publicis' attempts to strengthen its relationship with Purdue and to assist Purdue in selling opioids despite Purdue's 2007 criminal guilty plea. As part of the guilty plea, Purdue admitted that its "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medication." But rather than be deterred by this, Publicis charged on.

265.     During the 2010-2019 period in particular, Purdue relied extensively on Publicis to develop its sales and marketing strategy for OxyContin and later Hysingla and Butrans.  Publicis worked closely with Purdue on both the creation and implementation of OxyContin sales strategy. Publicis' work for Purdue included consulting, evaluation of research and development, risk management, product marketing, and implementation of any marketing strategies and schemes. Publicis was so committed to Purdue's mission to increase OxyContin sales that Publicis marketing executives would accompany Purdue sales representatives on prescriber visits and sales calls.

266.     With Publicis' help, Purdue's 2007 guilty plea and the Corporate Integrity Agreement became nothing more than slight bumps in Purdue's proverbial speedway to maximum profits from opioid sales.  In 2015 alone, Purdue obtained $3 billion in annual opioid sales – a four-fold increase from its 2006 sales of $800 million.

267.     Publicis' relationship with Purdue went far beyond a typical business relationship. Publicis worked closely with Purdue on both the creation and implementation of OxyContin sales strategy, a strategy Publicis knew was based on misleading and defrauding doctors and patients alike about a dangerous and highly addictive drug.

268.     Further, Publicis had access to detailed prescribing information enabling Publicis to determine if there were suspicious or problematic prescribing patterns.  Rather than using this information to help its clients prevent diversion of controlled substances, Publicis and Purdue used this information in furtherance of their scheme to defraud prescribers and Plaintiff, target and increase sales to prescribers who were overprescribing, and continue to fuel opioid addiction and the resulting epidemic.

**The Fraudulent Scheme**

269.     As detailed above, the operation of the Opioid Marketing Enterprise, included several schemes to defraud that helped to further the goals of Publicis and the Opioid Marketing Enterprise Members – *i.e*., to expand the market and increase profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and to increase profits for the Enterprise Members via expanding the market for opioids.

**Fraudulent Marketing Scheme: Deceptive Messaging Regarding Opioid Use**

270.     As described throughout, Publicis sought to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term, chronic pain by changing prescriber habits and public perception regarding the safety and efficacy of opioids. Publicis' fraud specifically targeted prescribers and set out to convince them that they should prescribe more and more opioids, overcoming what could otherwise be a check on opioid manufacturers' ability to increase sales of addictive products.

271.     Despite Publicis knowing that reformulated crush-resistant OxyContin could still be abused, and having advised Purdue on the design of tests on crush-resistant OxyContin as part of Purdue's FDA submission, in furtherance of the scheme to defraud, Publicis spread messages that prescribing the new formulations would deter opioid use disorder and addiction.  However, Publicis was well aware that these claims were completely unsupported by the studies' findings, and that, in fact, nothing in OxyContin's formulation would deter abuse or addiction and that patients could simply swallow higher amounts of pills.

272.     Publicis created strategies to repair Purdue's reputation from the hit it took from its 2007 criminal plea for illegally marketing OxyContin, to help boost OxyContin sales.

273.     Despite Publicis' knowledge that the crush-resistant reformulation did nothing to decrease opioid use disorder and addiction, Publicis pursued messaging and a strategy that was deceptive and was designed to deceive doctors in particular.  Knowing that Purdue pleaded guilty to offenses related to its marketing and distribution of addictive opioids, Publicis advised Purdue to market OxyContin to encourage more prescriptions (that it knew would lead to abuse and overdose events) into higher dose prescriptions by a smaller number of loyalist prescribers.

274.     Far from the deception of doctors being an unforeseen consequence, Publicis intentionally set out to target doctors as a cog in its scheme to defraud.  Indeed, deceiving doctors was part of the marketing scheme, and doctors were utilized in furtherance of the deception. Medical providers were not a break in the causal chain of harm to Plaintiff and Class members but were targeted players in the scheme to defraud and key links in the casual chain to get to patients who would become consumers and users of opioids.

275.     The marketing scheme involved using data to target high prescribers and training marketers to make misleading statements with the goal to increase high dose prescriptions, which Publicis and Opioid Marketing Enterprise Members knew were more likely to be abused.  Publicis and Opioid Marketing Enterprise Members knew that overdoses were expected and that such overdoses would lead to need for increased services.

276.     Purdue's 2020 guilty plea acknowledged its role in using aggressive marketing to convince doctors to prescribe opioids unnecessarily, fueling the drug addiction crisis.  Publicis was the architect that designed and implemented Purdue's OxyContin and later Hysingla's and Butrans' marketing scheme disregarding Purdue's 2007 guilty plea.  Starting in 2010, Publicis designed, developed, and helped implement these strategies.

277.    As detailed throughout, Publicis and the Opioid Marketing Enterprise Members were aware of the catastrophic injury inflicted on the public by selling harmful, addictive opioid products.  Yet when promoting opioids and engaging in doctor detailing, they all intentionally hid the potential for abuse and addiction by marketing OxyContin's 12-hour dosing as meaning that users only need to take OxyContin twice a day, thus requiring fewer pills.

278.    It was foreseeable that this marketing strategy would lead to greater addiction because OxyContin wore off after 8 to 10 hours in many patients.  Prescribing 12-hour dosing led to "end-of-dose failure[,]" which led to a vicious cycle that became "the perfect recipe for addiction[.]"[122]

279.    The marketing scheme worked.  Nationwide, based on an analysis by the *Los Angeles Times*, more than 52% of patients taking OxyContin longer than three months are on doses greater than 60 milligrams per day – which converts to the 90 MME dose that the CDC Guidelines urge prescribers to "avoid" or "carefully justify."[123]

280.    A key element of the marketing scheme that fueled the deadly epidemic of opioid abuse was doctor detailing using detailed prescriber data.

**Data Scheme: Use of Prescriber Data for Intentional Targeting of High Opioid Prescribers – Not Diversion Prevention**

281.    Distributors of controlled substances, including manufacturers, have a legal duty to report suspicious orders, and to report those that deviate substantially from a normal pattern and orders of unusual size and frequency.  *See* 21 U.S.C. §823; 21 C.F.R. §1301.74(b).  These obligations included a legal duty to maintain effective controls and procedures to guard against

---

[122]  Harriet Ryan, et al., "*You Want a Description of Hell?" OxyContin's 12-Hour Problem*, L.A. TIMES (May 5, 2016), http://www.latimes.com/projects/oxycontin-part1.

[123]  CDC Guidelines at 16.

diversion of controlled substances and a legal duty to maintain a system to identify and report suspicious orders of controlled substances.  *See* 21 C.F.R. §§1301.7(a) and (b); 1301.74(b).  Rather than advising its registrant clients, the opioid manufacturers, on how to comply with its legal duties to maintain effective controls to guard against diversion and how to operate a system to identify and report suspicious orders, in furtherance of the scheme, Publicis used detailed data to target prescribers to grow the opioid market.

282.    Consistent with the Opioid Marketing Enterprise's purpose of increasing profit by deceptively marketing opioids, Publicis was tasked with identifying growth opportunities for OxyContin, Opana, Fentora, and other opioid drugs, conducting assessments of the underlying drivers of their current performance, and identifying key opportunities to combat any public health efforts that would hinder that performance.

283.    Publicis had access to physician-level sales data and used it to develop its marketing strategy to increase sales of OxyContin and other opioid drugs.  Rather than using this access to the data to avoid diversion and to prevent Opioid Marketing Enterprise Members from targeting prescribers with suspicious prescribing patterns, or to halt flagged prescribers from continuing to issue unnecessary and harmful prescriptions, Publicis used this information to help the Opioid Marketing Enterprise Members push more opioids on high volume prescribers in furtherance of its schemes to defraud.  The targets were chosen based on their history of prescribing high doses of opioids in large quantities.

284.    Publicis and the Opioid Marketing Enterprise Members used the data for intentional targeting of high prescribers and not for diversion prevention.  For example, Publicis advised Purdue to raise sales of OxyContin by focusing on high dose sales, which were the most profitable, and deceptively messaged to physicians that OxyContin would improve function and quality of

life. Publicis urged Purdue to maximize sales by dictating which prescribers its sales representatives would target. For example, Publicis advised Purdue that it should take "specific actions" to increase sales of OxyContin, including "Targeting Prolific Prescribers," "Influencing *No See* Prescribers," and "Targeting Nurse Practitioners and Physicians Assistants."

285. The Opioid Marketing Enterprise's scheme also explored ways to increase the amount of time sales representatives spent in the field increasing opioid sales, and prioritizing OxyContin in incentive compensation targets.

286. By targeting physicians based on their prescribing patterns, Publicis and the Opioid Marketing Enterprise was working toward the common purpose of deceptively convincing doctors to prescribe more opioids, and thereby, increase their own profits. The plan was aimed at boosting sales of OxyContin by targeting the highest volume opioid prescribers, which Publicis and other Opioid Marketing Enterprise Members knew, or should have known, would result in the expansion of the illicit opioid market.

287. The Opioid Marketing Enterprise sought to grow opioid sales to prescribers who raised red flags of diversion and orders it knew, or should have known, were likely to be diverted or fuel an illegal market. Purdue had a legal obligation not to target these prescribers; rather, it was obligated to report their conduct to law enforcement. Yet, Publicis turned a blind eye to Purdue's legal obligations staying forever focused on expanding the opioid market and cashing in on indiscriminate distribution of opioid prescriptions. The Opioid Marketing Enterprise used access to prescriber data not to report diversion but to enhance diversion.

**Pattern of Racketeering Activity**

288. Publicis together with other Opioid Marketing Enterprise Members engaged in a scheme to unlawfully increase sales of opioids – and grow their respective shares of the prescription painkiller market – through repeated and systematic misrepresentations about the

safety and efficacy of opioids for treating long-term chronic pain.  As a unique consulting entity with knowledge of both the addictive properties and abuse potential of opioids and with access to data regarding internal prescribing behaviors of its targets, Publicis perpetrated a number of fraudulent schemes using the mails and wires, including advising Purdue to market more opioids directly to patients and to get them comfortable with asking their prescribers and providers to prescribe opiates and in higher doses.  Publicis also encouraged Purdue and other opioid manufacturers to target high volume prescribers while helping to downplay the risks of opioids and training its sales representatives on how to overcome prescriber objections to the safety of OxyContin and other opioid drugs.  Publicis fueled the epidemic alongside its clients.  Through targeted marketing that Publicis developed and implemented, Publicis substantially contributed to extending the life and use of opioids across the United States when use should have declined and diminished following Purdue's 2007 guilty plea.  Publicis, at all times relevant, was and is an enterprise that is engaged in and affects interstate commerce because the company advised opioid manufacturers on the sale of opioid products across the United States, as alleged herein.

289.    The Opioid Marketing Enterprise Members devised and knowingly carried out this illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive, and effective use of opioids for long-term chronic, non-acute, and non-cancer pain.  They knew that these representations deviated from the FDA-approved use of these drugs and were not supported by actual evidence.  The Opioid Marketing Enterprise Members intended that their common purpose and scheme to defraud would, and did, deceive consumers, prescribers, regulators, and payors, including Plaintiff and the Class, and other intended victims and they used the U.S. mail

and interstate wire facilities with the specific intent to advance, and for the purpose of executing, their illegal scheme.

290.    By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain, Publicis and Opioid Marketing Enterprise Members engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

291.    To achieve the common goal and purpose of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members hid from the consumers, prescribers, regulators, and payors, including Plaintiff and the Class: (a) the fraudulent nature of the Opioid Marketing Enterprise Members' marketing scheme; (b) the fraudulent nature of statements made by the Opioid Marketing Enterprise Members regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

292.    The Opioid Marketing Enterprise Members with knowledge and intent, of the overall objective of the Opioid Marketing Enterprise Members' fraudulent scheme, participated in a common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

293.    Indeed, for the Opioid Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids.  This coordination was accomplished via their relationships with each other.

294.    The Opioid Marketing Enterprise Members' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiff, while simultaneously generating billion-dollar revenues and profits for the Opioid Marketing Enterprise Members.  The predicate

acts were committed or caused to be committed by Publicis through its participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

295.     The Opioid Marketing Enterprise Members' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity.  Publicis in particular used mail and wire transmission, directly or indirectly, in furtherance of this scheme by transmitting deliberately false and misleading statements to prescribers, pain patients and the public.

296.     Publicis had a specific intent to deceive and defraud prescribers, patients, and payors, including Plaintiff and the Class.  For example, as alleged above, Publicis developed and distributed repeated and unequivocal statements through the mails and wires that were false and misleading.  Publicis advised Purdue to market OxyContin based on the false and misleading notions while downplaying the risks that Publicis knew were inherent in prescription opioids.

297.     Similarly, Publicis caused to be transmitted through the mails and wires false and misleading statements regarding the addiction potential of opioids.  Moreover, Publicis promoted and directed Purdue to deploy email campaigns to prompt prescribers to download OxyContin "Savings Cards," a campaign that led to 67,000 more OxyContin prescriptions in just one year.

298.     Publicis' marketing scheme is especially egregious since the public relies on physicians as a position of trust and authority in the community regarding their health and well-being.  Publicis intentionally deceived physicians regarding the abuse potential of opioids.  It intended prescribers and the public to rely on its false statements.  Publicis intended reliance on these false statements with reckless disregard for the danger these pills posed to the public.  This scheme was therefore reasonably calculated to deceive not only persons of ordinary prudence and comprehension but also educated physicians in a place of high trust in the community.

**Predicate Acts**

299.    To carry out, or attempt to carry out, the scheme, Publicis and the Opioid Marketing Enterprise Members, each of whom is a person associated-in-fact with the Enterprise, knowingly conducted or participated in, directly or indirectly, the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. §§1341 (mail fraud) and 1343 (wire fraud).

300.    Specifically, Publicis has committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§1341 and 1343), within the past ten years.

301.    The multiple acts of racketeering activity which Publicis and the Opioid Marketing Enterprises Members committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

302.    The racketeering activity was made possible by Publicis' and the Opioid Marketing Enterprise's regular use of the facilities, services, distribution channels, and employees of the Enterprise Members.

303.    Publicis and the Opioid Marketing Enterprise Members participated in the schemes by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

304.    In devising and executing the illegal schemes, Publicis and the Opioid Marketing Enterprises Members devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiff and Class members and to obtain money by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

305.     For the purpose of executing the illegal schemes, Publicis and the Opioid Marketing Enterprise Members committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal schemes.

306.     The Opioid Marketing Enterprise Members' predicate acts of racketeering (18 U.S.C. §1961(1)) include, but are not limited to, the conduct described in the Factual Allegations section of this Complaint, and:

(a)     Mail Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. §1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

(b)     Wire Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. §1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

307.     Indeed, as summarized herein, the Opioid Marketing Enterprise Members used the mail and wires to send or receive thousands of communications, publications, representations, statements, electronic transmissions and payments to carry out the unlawful Opioid Marketing Enterprise's fraudulent scheme, including essentially uniform misrepresentations, concealments, and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute, and non-cancer pain, with the goal of profiting from the increased sales of the Opioid Marketing Enterprise Members' drugs that occurred because consumers, prescribers, regulators, and payors, like Plaintiff and the Class, relied on the Opioid Marketing Enterprise Members' misrepresentations. These uses of the U.S. mail or interstate wires included, inter alia:

(a)     marketing materials about opioids and their risks and benefits, which the Opioid Marketing Enterprise Members sent to health care providers, transmitted through the internet and television, and published across the country, including in counties and cities and on Tribal Reservations and to Plaintiff and Class members and their agents;

(b)     written representations and telephone calls among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of opioids for chronic, long-term pain generally;

(c)     emails, telephone calls, and written communications among the Opioid Marketing Enterprise Members agreeing to or implementing the opioids marketing scheme;

(d)     communications among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members and the media regarding the publication, drafting, and dissemination of treatment guidelines as part of the Opioid Marketing Enterprise;

(e)     written and oral communications directed to prescribers, the public, Plaintiff and Class members and their agents that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

(f)     receipts of increased profits sent through the U.S. mail and interstate wire facilities – the wrongful proceeds of the scheme.

308.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities are not obtainable (*e.g*., each time a Publicis trained sales representative or marketer "calls" or reached out to a physician using the mails or wires in furtherance of the marketing scheme).  Because the Opioid Marketing Enterprise Members disguised their participation in the Enterprise, and worked to keep the Enterprise's existence secret, many of the precise dates of the

Opioid Marketing Enterprise's uses of the U.S. mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by the Opioid Marketing Enterprise Members. Indeed, an essential part of the successful operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy.  Plaintiff has, however, described the types of predicate acts of mail and/or wire fraud, including the specific types of fraudulent statements upon which, through the mail and wires, Publicis engaged in fraudulent activity in furtherance of their scheme.

309.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators and Plaintiff.  The Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the Opioid Marketing Enterprise Members understood and intended that those in the distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Opioid Marketing Enterprise Members' products.

310.    Below, Plaintiff also describes examples of occasions when Publicis disseminated misrepresentations and false statements to consumers, prescribers, payors and their agents, and Plaintiff, and how those acts were in furtherance of the scheme.

311.    Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which Publicis with the Opioid Marketing Enterprise Members defrauded and intended to defraud consumers, prescribers, regulators, Plaintiff, and other intended victims.

312.    These were not isolated incidents.  Instead, Publicis and the Opioid Marketing Enterprise Members engaged in a pattern of racketeering activity by committing thousands of predicate acts in a ten-year period, in the form of mail and wire fraud, and there remains a threat that such conduct will continue in the future.

313.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators, and Plaintiff. Publicis and the Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high.  In designing and implementing the scheme, the Opioid Marketing Enterprise Members understood and intended that those in the opioid distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Opioid Marketing Enterprise Members' products.

314.    Opioid Marketing Enterprise Members' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other.  Likewise, the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

315.    The racketeering activities conducted by Publicis and the Opioid Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, payors and their agents, and Plaintiff.  Each separate use of the U.S. mail and/or interstate wire facilities employed by the Opioid Marketing Enterprise was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators, and payors, like Plaintiff and Class members.  The Opioid Marketing

Enterprise Members have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

316.    Each of the Opioid Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§1341 and 1343 offenses.

317.    As described herein, the Opioid Marketing Enterprise Members engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

318.    The Opioid Marketing Enterprise Members' violations of law and their pattern of racketeering activity directly and proximately caused Plaintiff injury in its business and property. The Opioid Marketing Enterprise Members' pattern of racketeering activity logically, substantially and foreseeably caused an opioid epidemic.  Plaintiff's injuries, as described below, were not unexpected, unforeseen or independent.  Rather, as Plaintiff alleges, the Opioid Marketing Enterprise Members knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse.  Nevertheless, the Opioid Marketing Enterprise Members engaged in a scheme of deception that utilized the mail and wires in order to carry out the Opioid Marketing Enterprises' fraudulent scheme, thereby increasing sales of their opioid products.

319.    It was foreseeable and expected that the Opioid Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose.

**Publicis Was Well Aware of Risks of Abuse Before It Launched Its Marketing Scheme**

320.    These devastating results of the opioid crisis were eminently foreseeable by Publicis and the Opioid Marketing Enterprise Members.

321.    When Purdue pleaded guilty in 2007, it was evident that Purdue's behavior and excessive prescribing was directly linked to a drug addiction crisis that caused severe and extensive damage to America.  Purdue's methods included "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids – frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."[124]

322.    Publicis cannot deny knowledge regarding Purdue's 2007 guilty plea.  At that point, Publicis knew that opioids were addictive and that OxyContin was being widely abused and causing harm to people and entities like Plaintiff and Class members.  Publicis knew that Purdue had been fraudulently marketing OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal.  And yet, years later, in 2010, Publicis jumped at the opportunity to continue to aggressively promote opioids despite knowledge that people were still dying from overdoses.

323.    Publicis continued to add fuel to this fire by persisting in aggressively marketing to physicians and continuing to fuel the opioid crisis long after Purdue's guilty plea.  Even when Publicis became intimately aware of the harm being caused by OxyContin, it was all too excited

---

[124] Jan Hoffman & Katie Benner, *Purdue Pharma Pleads Guilty to Criminal Charges for Opioid Sales*, N.Y. TIMES (Sept. 1, 2021), https://www.nytimes.com/2020/10/21/health/purdue-opioids-criminal-charges.html.

to be awarded the Hysingla and Butrans accounts to further permeate and proliferate the prescription opioid crisis in America.  It was foreseeable that continuing to do so would devastate American communities.

324.    Defendant's misleading marketing and failure to prevent prescription opioid diversion damaged Plaintiff and its authorizing tribes and villages.  Defendant's misconduct has contributed to a range of social problems, including violence and delinquency.  Adverse social outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair.  As a result, more and more of Plaintiff's resources are devoted to addiction-related problems.

325.    Similarly, news stories across the nation reported additional consequences of wide scale opioid addiction: needles littered around public property, posing costs to the governments and danger to residents.[125]

326.    The foreseeability of the abuse and need for additional services that would be required following the misleading marketing and increased prescribing and use of high dose opioids was obvious.  Indeed, Publicis knew, or should have known, that increased prescriptions would lead to overdoses and to an additional financial burden for social and health services.

327.    Publicis is liable for its successful efforts to increase OxyContin sales after Purdue's 2007 guilty plea for misbranding the drug. Indeed, Publicis' focus on increasing opioid sales after Purdue's guilty was incendiary to escalating and perpetuating the opioid epidemic by: (a) using data to specifically target high volume prescribers; (b) persuading sales of higher doses

---

[125] *See, e.g.*, Emily Sweeney, *Hypodermic needles litter landscape south of Boston*, BOSTON GLOBE (Oct. 26, 2014), https://www.bostonglobe.com/metro/regionals/south/2014/10/25/hypodermic-needles-litter-landscape-south-boston/pzgmgbyjYFCD967TePDyiM/story.html.

of opioids; (c) tailoring marketing messages to conceal their addictive principles; and (d) by reducing the training of sales representatives.

328.    Publicis cannot deny that it was not aware of the abuse and overdose potential of opioids when it provided estimates for the future costs of overdose or opioid use disorder events.

329.    Publicis and the other Opioid Marketing Enterprise Members marketed a product, through intentionally deceptive means, that it knew would result in consumer deaths and harm to Plaintiff and Class members.  This is not an attenuated causal chain.  Rather, aggressively marketing to high prescribing individuals, and training to not fully disclose the risk of abuse, were integral parts of the marketing scheme.  Deceptive messaging to targeted prescribers who were likely to prescribe increased doses with an anticipated abuse potential was part and parcel of the scheme to defraud.

330.    As a result, Plaintiff and Class members have shouldered the burden of these anticipated increased services and harm to business and property that are inherently tied to opioid abuse and misuse, and both the increased services and harms were reasonably and actually expected from increased prescribing.

331.    Publicis' goal was to increase opioid prescribing, and it knew that doing so would also result in the need for increased medical services.  It was also foreseeable that increased prescriptions would also result in increased costs to Plaintiff and Class members throughout the United States.

332.    But for the increase in prescribed opioids, Plaintiff and Class members would not have had to expend additional resources or suffered other harm to business and property as a result of harms associated with opioid addiction.  Publicis and the Enterprise Members persisted in targeting prescribers to prescribe high doses of opioids and knew that doing so would result in

adverse health and social outcomes, including overdoses, neo-natal complications, harm to communities like Plaintiff's and Class members', hazardous waste in Plaintiff's communities, as well as and increased expenditures on services to combat such ill effects.

**Plaintiff's and Class Members' Business and Property Have Been Damaged by Publicis' RICO Violations**

333.    Specifically, the Opioid Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme has injured Plaintiff and the Class in the form of substantial losses of money and property that logically, directly, and foreseeably arise from the opioid-addiction epidemic.  Plaintiff's and Class members' injuries, as alleged throughout this Complaint, and expressly incorporated herein by reference, include:

(a)    costs paid and incurred by Plaintiff and the Class for prescription opioid drugs manufactured, marketed, sold, or distributed by Purdue and other Opioid Marketing Enterprise Members, for purposes other than resale (intended for consumption by its covered participants, their dependents, and covered retirees);

(b)    costs paid and incurred by Plaintiff and the Class for providing healthcare and medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

(c)    costs paid and incurred by Plaintiff and the Class for providing mental-health services, treatment, counseling, rehabilitation services, and social services to covered participants, their dependents, and covered retirees who are victims of the opioid epidemic;

(d)    costs paid and incurred by Plaintiff and the Class for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

(e)      costs paid and incurred by Plaintiff and the Class associated with emergency responses for their covered participants, their dependents, and covered retirees by first responders to opioid overdoses; and

(f)      costs of death benefits paid by Plaintiff and the Class to beneficiaries of participants, who died as a result of opioid use disorder.

### COUNT II

**Violation of the Ohio Corrupt Practices Act**
**Ohio Revised Code §2923.31, *et seq*.**
**(On behalf of Plaintiff and the Ohio Subclass)**

334.    For efficiency and to avoid repetition, Plaintiff incorporates by reference the paragraphs of Plaintiff's Count I above as if fully set forth herein, and further alleges as follows:

**Publicis and the Opioid Marketing Enterprise Members' Pattern of Corrupt Activity**

335.    Publicis was a person and member of an association-in-fact enterprise, the Opioid Marketing Enterprise, within the meaning of Ohio Rev. Code Ann. §2923.31(G).

336.    As alleged above, Publicis and Opioid Marketing Enterprise Members conducted and participated in the conduct of the affairs of the Opioid Marketing Enterprise through a pattern of "corrupt activities," as defined in Ohio Rev. Code Ann. §2923.31(I)(1) and (2).

337.    As previously alleged, Publicis and Opioid Marketing Enterprise Members engaged in a pattern of corrupt activity by committing mail fraud (18 U.S.C. §1341) and wire fraud (18 U.S.C. §1343).  Publicis and Opioid Marketing Enterprise Members' acts also constitute a pattern of telecommunications fraud (Ohio Rev. Code Ann. §2913.05).  Publicis and Opioid Marketing Enterprise Members formed an association-in-fact enterprise in order to unlawfully increase the demand for opioids.  Through their personal relationships, Publicis and the Opioid Marketing Enterprise Members had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose.  Their substantial financial contribution to the Opioid

Marketing Enterprise, and the advancement of opioids-friendly messaging, fueled the U.S. opioids epidemic.

338. Publicis and Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use, including: (a) that addiction is rare among patients taking opioids for pain; (b) that addiction risk can be effectively managed; (c) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition named "pseudoaddiction"; (d) that withdrawal is easily managed; (e) that increased dosing presents no significant risks; (f) that long-term use of opioids improves function; (g) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (h) that use of time-released dosing prevents addiction; and (i) that ADFs provide a solution to opioid abuse.

**Harms Felt and Relief Sought**

339. Publicis' and Opioid Marketing Enterprise Members' violations of law and their pattern of racketeering activity directly or indirectly caused Plaintiff's and Class members' injuries. Publicis' and Opioid Marketing Enterprise Members' pattern of racketeering activity logically, substantially, and foreseeably caused and exacerbated an opioid epidemic. Plaintiff's and Class members' injuries, as described below, were not unexpected, unforeseen, or independent. Rather, Publicis and Opioid Marketing Enterprise Members knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse. Nevertheless, Publicis and Opioid Marketing Enterprise Members engaged in a scheme of deception, which utilized the mail and wires as part of their fraud, in order to increase sales of opioid products.

340.    It was foreseeable and expected that a massive marketing campaign utilized by Publicis and Opioid Marketing Enterprise Members misrepresented the non-addictive and effective use of prescription opioids for purposes for which they are not suited and not approved by the FDA would lead to a nationwide opioid epidemic.  It was also foreseeable and expected that the marketing campaigns would lead to increased opioid addiction and overdose.  Plaintiff's and Class members' injuries were logically, foreseeable, and substantially caused by the opioid epidemic that the Publicis and the Opioid Marketing Enterprise Members created.

341.    Specifically, the Opioid Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme has injured Plaintiff and the Class in the form of substantial losses of money and property that logically, directly, and foreseeably arise from the opioid-addiction epidemic.  Plaintiff's and Class members' injuries, as alleged throughout this Complaint, and expressly incorporated herein by reference, include:

(a)    costs paid and incurred by Plaintiff and the Class for prescription opioid drugs manufactured, marketed, sold, or distributed by Purdue and other Opioid Marketing Enterprise Members, for purposes other than resale (intended for consumption by its covered participants, their dependents, and covered retirees);

(b)    costs paid and incurred by Plaintiff and the Class for providing healthcare and medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

(c)    costs paid and incurred by Plaintiff and the Class for providing mental-health services, treatment, counseling, and rehabilitation services, and social services to covered participants, their dependents, and covered retirees who are victims of the opioid epidemic;

(d)      costs paid and incurred by Plaintiff and the Class for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

(e)      costs paid and incurred by Plaintiff and the Class associated with emergency responses for their covered participants, their dependents, and covered retirees by first responders to opioid overdoses; and

(f)      costs of death benefits paid by Plaintiff and the Class to beneficiaries of participants, who died as a result of opioid use disorder.

342.    Plaintiff seeks all legal and equitable relief as allowed by law, including, *inter alia*, actual damages; treble damages; equitable and/or injunctive relief, including corrective statements, information, and education, under Ohio Rev. Code Ann. §2923.34(B)(1)-(2), requiring divestiture by, and reasonable restrictions upon, the future activities of Publicis; forfeiture as deemed proper by the Court; attorney's fees and all costs; expenses of suit; and pre- and post-judgment interest.

### COUNT III

### Unjust Enrichment

343.    As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Publicis has profited and benefited from the increase in the distribution and purchase of opioids to those whose health care costs were the payors' obligation, including from opioids foreseeably and deliberately diverted within and into those communities.

344.    Plaintiff has expended substantial amounts of money to fix or mitigate the societal harms caused by Publicis' conduct.  Plaintiff and the Class have conferred benefits upon Publicis by paying for what may be called Publicis' externalities – the costs of the harm caused by Publicis' negligent or otherwise unlawful distribution and sales practices.

345. Publicis is aware of these obvious benefits, and that retention of these benefits is unjust.

346. Because of their deceptive marketing of prescription opioids, Publicis obtained enrichment they would not otherwise have obtained. Because of their conscious failure to exercise due diligence in preventing diversion, Publicis obtained enrichment it would not otherwise have obtained. The enrichment was without justification and Plaintiff and the Class lack a remedy provided by law.

347. Publicis made substantial profits while fueling the prescription drug epidemic in the communities served by Plaintiff and the Class.

348. Publicis has been unjustly enriched by its negligent, intentional, malicious, oppressive, illegal, and unethical acts, omissions, and wrongdoing.

349. It would be inequitable to allow Publicis to retain benefit or financial advantage.

350. Publicis' misconduct alleged in this case has caused ongoing and persistent harm to Plaintiff and the Class.

351. Plaintiff demands judgment against Publicis for restitution, disgorgement, and any other relief allowed in law or equity.

## COUNT IV

### Common Law Absolute Public Nuisance

352. Publicis created and maintained a public nuisance which proximately caused injury to Plaintiff and the Class.

353. A public nuisance is an unreasonable interference with a right common to the general public.

354. Publicis has created and maintained a public nuisance by promoting and marketing opioids in ways that unreasonably interfere with the public health, welfare, and safety in Plaintiff's

and Class members' communities, and Plaintiff, Class members, and residents of their communities have a common right to be free from such conduct and to be free from conduct that creates a disturbance and reasonable apprehension of danger to person and property.

355.    This public nuisance is an ***absolute*** public nuisance because Publicis' nuisance creating conduct was intentional and unreasonable and/or violated statutes which established specific legal requirements for the protection of others.

356.    Publicis has created and maintained an absolute public nuisance through its ongoing conduct of promoting, marketing, distributing, and selling opioids – dangerously addictive drugs – in a manner which caused prescriptions and sales of opioids to skyrocket in Plaintiff's and Class members' communities, flooded their communities with opioids, and facilitated and encouraged the flow and diversion of opioids into illegal, secondary markets, resulting in devastating consequences to Plaintiff, Class members, and their communities.

357.    Publicis knew, and has known, that its intentional, unreasonable, and unlawful conduct will cause, and has caused, opioids to be used and possessed illegally and that its conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of Plaintiff, Class members, and their communities.

358.    Publicis' conduct has created an ongoing, significant, unlawful, and unreasonable interference with rights common to the general public, including the public health, welfare, safety, peace, comfort, and convenience of Plaintiff, Class members, and their communities.  *See* Restatement (Second) of Torts §821B.

359.    The interference is unreasonable because Publicis' nuisance-creating conduct:

(a)     involves a significant interference with the public health, the public safety, the public peace, the public comfort, and/or the public convenience;

(b)     at all relevant times was and is proscribed by state and federal laws and regulations; and/or

(c)     is of a continuing nature and, as Publicis knows, has had and is continuing to have a significant effect upon rights common to the general public, including the public health, the public safety, the public peace, the public comfort, and/or the public convenience.

360.    Publicis intentionally and unreasonably and/or unlawfully worked with opioid manufacturers to deceptively market and push as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics, resulting in increased addiction and abuse, an elevated level of crime, death and injuries to Plaintiff's and Class members' participants and residents of Plaintiff's and Class members' communities, a higher level of fear, discomfort, and inconvenience to the residents of Plaintiff's and Class members' communities, and direct costs to Plaintiff and Class members.

361.    Publicis is liable for creating the public nuisance because the intentional and unreasonable and/or unlawful conduct of Publicis was a substantial factor in producing the public nuisance and harm to Plaintiff and Class members.

362.    Publicis' unlawful nuisance-creating conduct includes: promoting, marketing, and/or selling opioids in ways that facilitated and encouraged their flow into the illegal, secondary market; and promoting, marketing, and/or selling of opioids prescribed by "pill mills" when Publicis knew, or should have known, the opioids were being prescribed by "pill mills."

363.    The gravity of the harm caused by Publicis' intentional and unreasonable nuisance-creating conduct outweigh the utility of the conduct.

364.    Publicis intentionally and unreasonably promoted and encouraged the distribution and sale of opioids that Publicis knew would be diverted into the illegal, secondary market and would be obtained by persons with criminal purposes.

365.    Publicis intentionally and unreasonably engaged in a deceptive marketing scheme that was designed to, and successfully did, change the perception of opioids and cause their prescribing and sales to skyrocket in Plaintiff's and Class members' communities.

366.    Publicis intentionally and unreasonably misled Plaintiff, other payors, healthcare providers, and the public about the risks and benefits of opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain.

367.    Publicis violated Ohio and federal statutes and regulations by engaging in the deceptive marketing of opioids, as described in this Complaint.

368.    In the distribution and sale of opioids in Ohio and throughout the United States, Publicis violated and/or aided and abetted violations of Ohio Rev. Code §2925.02(A), which states:

"No person shall knowingly do any of the following:

(1) By force, threat, or deception, administer to another or induce or cause another to use a controlled substance; . . . [or]

(3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become a person with drug dependency."

369.    Publicis' clients are in the business of marketing, advertising, and/or selling prescription drugs, including opioids, which are specifically known to Publicis to be dangerous because *inter alia* these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

370. Indeed, opioids are akin to medical-grade heroin. Publicis' wrongful conduct of deceptively advertising, promoting, marketing, and pushing as many opioids onto the market as possible led directly to the public nuisance and harm to Plaintiff and Class members – exactly as would be expected when medical-grade heroin in the form of prescription opioids are deceptively marketed, flood the community, and are diverted into an illegal, secondary market.

371. Publicis had control over its conduct in Plaintiff's and Class members' communities, and that conduct has had an adverse effect on rights common to the general public. Publicis controlled and participated in its clients' deceptive advertising and efforts to mislead the public, including its acts and omissions in detailing by account directors, marketing strategies, sales representatives, online communications, publications, and other speaking events, and other means as described in this Complaint.

372. It was reasonably foreseeable that Publicis' actions and omissions would result in the public nuisance and harm to Plaintiff and Class members described herein.

373. Because of Publicis' and the Opioid Marketing Enterprise Members' deceptive marketing of opioids and its clients' special positions within the closed system of opioid promotion and distribution, without Publicis' and the Opioid Marketing Enterprise Members' actions, opioid use would not have become so widespread, and the enormous public health hazard of prescription opioid and heroin overuse, abuse, and addiction that now exists would have been averted.

374. The public nuisance created by Publicis' actions is substantial and unreasonable. It has caused and continues to cause significant harm to Plaintiff's and Class members' communities, and the harm inflicted outweighs any offsetting benefit.

375. The externalized risks associated with Publicis' nuisance-creating conduct as described herein greatly exceed the internalized benefits.

376.    As a direct and proximate result of Publicis' tortious conduct and the public nuisance created by Publicis, Plaintiff and Class members have suffered and will continue to suffer economic damages, as detailed herein.

377.    As a direct and proximate result of Publicis' tortious conduct and the public nuisance created by Publicis, Plaintiff has suffered and will continue to suffer stigma damage, non-physical property damage, and damage to its proprietary interests.

378.    The nuisance created by Publicis' conduct is abatable.

379.    Publicis' misconduct alleged in this case is ongoing and persistent.

380.    Publicis' misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence.  Plaintiff alleges wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

381.    Plaintiff has incurred expenditures for special programs over and above Plaintiff's ordinary services.

382.    Plaintiff seeks to abate the nuisance created by Defendant's unreasonable, unlawful, intentional, ongoing, continuing, and persistent actions and omissions and unreasonable interference with rights common to the general public.

383.    Plaintiff and Class members have suffered, and will continue to suffer, unique harms as described in this Complaint, which are of a different kind and degree than Ohio citizens – and citizens of other States – at large.  These are harms that can only be suffered by Plaintiff.

384.    Plaintiff is asserting its own rights and interests and Plaintiff's claims are not based upon or derivative of the rights of others.

385.    The tortious conduct of Publicis was a substantial factor in creating the absolute public nuisance asserted in this Complaint.

386.    The tortious conduct of Publicis was a substantial factor in producing harm to Plaintiff and Class members.  Plaintiff and Class members have suffered an indivisible injury as a result of the tortious conduct of Publicis.

387.    Publicis acted with actual malice because Publicis acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

388.    Plaintiff asserts this Cause of Action as a common law tort claim for absolute public nuisance and not as a "product liability claim" as defined in Ohio Rev. Code §2307.71.  In this Claim, Plaintiff does not seek damages for death, physical injury to person, emotional distress, or physical damages to property, as defined under the Ohio Product Liability Act, Ohio Rev. Code §2307.71 *et seq.*

389.    Plaintiff does seek all legal and equitable relief as allowed by law, including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by Publicis, including, but not limited to, attorney fees and costs, and pre- and post-judgment interest.

## X.    JURY DEMAND

Plaintiff, on behalf of itself and all others similarly situated, requests a trial by jury on all issues so triable.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, respectfully prays that this Court grant the following relief:

A.      for an order certifying the proposed Class herein;

B.      enter judgment in favor of Plaintiff and the Class, on behalf of itself and all others similarly situated, against Defendant awarding Plaintiff its actual damages for the damages caused by the opioid epidemic, including, but not limited to: (a) costs for opioids that Plaintiff and the Class paid for in whole or in part; (b) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (c) costs for providing treatment, counseling, and rehabilitation services; (d) costs of emergency of other medical services caused by opioid use disorder; and (e) costs of death benefits paid to beneficiaries of participants, who died as a result of opioid use disorder.

C.      enter a judgment disgorging Defendant's ill-gotten gains;

D.      order Defendant to fund an "abatement fund" for the purposes of abating the opioid nuisance;

E.      enjoin Defendant from continuing or repeating the wrongful conduct alleged herein and from the publication and/or dissemination of false and misleading materials directly or indirectly;

F.      enter judgment against Defendant requiring Defendant to pay civil penalties, treble damages, and punitive damages, where available;

G.      enter judgment against Defendant awarding Plaintiff its reasonable attorneys' fees, all costs and expenses, pre- and post-judgment interest; and

H.      all other such and further relief as this Court may deem just and proper.

DATED:  April 12, 2024

Respectfully submitted,

/s/ *Jonah D. Grabelsky*
Jonah D. Grabelsky
George H. Faulkner
**FAULKNER, HOFFMAN & PHILLIPS, LLC**
20445 Emerald Parkway Dr. Ste. 210
Cleveland, Ohio 44135
Telephone: (216) 781-3600
faulkner@fhplaw.com
grabelsky@fhplaw.com

Mark J. Dearman
Dorothy P. Antullis
Alexander C. Cohen
Anny M. Martin
**ROBBINS GELLER RUDMAN
& DOWD LLP**
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  (561) 750-3000
Fax: (561) 750-3364
mdearman@rgrdlaw.com
dantullis@rgrdlaw.com
acohen@rgrdlaw.com
amartin@rgrdlaw.com

Joseph H. Meltzer
Darren J. Check
Terence S. Ziegler
Jordan E. Jacobson
**KESSLER TOPAZ MELTZER
& CHECK LLP**
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
jmeltzer@ktmc.com
dcheck@ktmc.com
tziegler@ktmc.com
jjacobson@ktmc.com

*Attorneys for Plaintiff*